Keith W. Heard
Burke & Parsons
100 Park Avenue
New York NY  10017-5533
Telephone:  (212) 354-3800
Facsimile:  (212) 221-1432
Email:    heard@burkeparsons.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SK SHIPPING CO., LTD. and SK B&T PTE. LTD.,**<br>**individually and on behalf of M/V AZURIT**<br>**(IMO No. 9551703),**<br><br>                    **as Plaintiffs,**<br><br>                    **v.**<br><br>**NUSTAR ENERGY SERVICES, INC.,**<br>**O.W. BUNKER MIDDLE EAST DMCC;**<br>**O.W. BUNKER USA INC., and ING BANK N.V.,**<br><br>                    **as Defendants.** | **15 Civ. _____ (____)**<br><br><br><br>**COMPLAINT FOR INTERPLEADER**<br><br>**ECF CASE** |

Plaintiffs SK Shipping Co. Ltd. and SK B&T Pte. Ltd. ("Plaintiffs"), by and through their

attorneys Burke & Parsons, bring this action pursuant to Rule 9(h) of the Federal Rules of Civil

Procedure, as and for their Complaint for Interpleader pursuant to 28 U.S.C. §§ 1335(a) and

2361 and they allege, upon information and belief, as follows:

**The Parties**

1.       Plaintiff SK Shipping Co. Ltd. ("SK Shipping") is a foreign corporation or business

entity organized and existing under and pursuant to the laws of the Republic of Korea, with an

office and place of business at 19th Floor, 24, Toegye-ro, Jung-gu, Seoul, 100-711, South Korea. At certain times relevant to this action, SK Shipping was the time charterer of the M/V AZURIT ("the Vessel") pursuant to a time charter contract on the New York Produce Exchange form between SK Shipping, as Charterer, and Conti 185. Schifffahrts-GmbH & Co. KG Nr. 1 MV 'MS CONTI AZURIT,' as Owner, dated August 14, 2014.  Pursuant to the terms of the time charter, SK Shipping was required to purchase and provide fuel for the Vessel during the period of the contract.   In addition, SK Shipping was required to prevent maritime liens from arising in connection with the Vessel's operation under the charter.

2.      Plaintiff SK B&T Pte. Ltd. ("SK Bunkering") is a foreign corporation or business entity organized and existing under and pursuant to the laws of a foreign country, with an office and place of business at 9 Raffles Place, # 53-02, Republic Plaza, Singapore SG-048619, Republic of Singapore.  SK Bunkering serves as the bunker purchasing agent for the vessels that are owned or time chartered by SK Shipping, including the M/V AZURIT.

3.      Defendant NuStar Energy Services Inc. ("NuStar") is a corporation or other business entity organized and existing under and pursuant to the laws of the state of Delaware, with an office and place of business at 30 North Loop 1604 West, San Antonio, TX 78248.

4.      Defendant O.W. Bunker Middle East DMCC ("OWB-ME") is a corporation or other business entity organized and existing under and pursuant to the laws of a foreign country, with an office and place of business at Units No. 709 & 710, Indigo Tower, Plot No. D1, Jumeirah Lake Towers, Dubai, United Arab Emirates.

5.      Defendant O.W. Bunker USA Inc. ("OWB-USA") is a corporation or other business entity organized and existing under and pursuant to the laws of the state of Texas, with an office and place of business at Suite 440, 2603 Augusta Drive, Houston, TX  77057.

6.      Defendant ING Bank, N.V. ("ING") is a banking corporation or other business entity organized and existing under and pursuant to the laws of The Netherlands with an office and place of business at Amsterdamse Poort, Bijlmerplein 888, 1102 Amsterdam, The Netherlands.

**Jurisdiction and Venue**

7.      This Court has jurisdiction over this action under 28 U.S.C. § 1333 and Fed. R. Civ. P. 9(h) because it involves the interpleader of funds in the possession of plaintiffs, SK Shipping Co., Ltd. and SK B&T Pte. Ltd., relating to and in connection with payment pursuant to a bunker supply contract for the provision of necessaries (i.e., marine fuel or bunkers) to a vessel, the M/V AZURIT.

8.      This Court has original jurisdiction over this interpleader action pursuant to 28 U.S.C. § 1335(a) in that, for the bunker payments in question, (a) at least two of the claimants are of diverse citizenship; (b) the disputes between the claimants each involve funds in an amount  exceeding $500.00, exclusive of interest and costs; and (c) Plaintiff SK Bunkering, as the bunker purchaser for the vessel's time charterer, is the stakeholder of the disputed funds and, concurrently with the filing of this Complaint, will seek to make a deposit into the Court's Registry in the principal sum of at least $340,048.06, which is the amount due for fuel delivered to the Vessel on October 21, 2014. Additionally, Plaintiff will seek to deposit an interest component to the principal sum in the amount of $20,402.88, for a total deposit of $360,450.94.

9.     This Court has personal jurisdiction over defendants OWB-ME and OWB-USA pursuant to the terms of the applicable bunker supply contracts and the O.W. Bunker Group's Standard Terms and Conditions.  In addition, this Court has jurisdiction over defendant OWB-ME under Fed.R.Civ.P. 4(k)(2) because, even if OWB-ME is not subject to jurisdiction in any state's courts of general jurisdiction, its overall contacts with the United States make this Court's exercise of jurisdiction over it consistent with the United States Constitution and laws.

10.     This Court has personal jurisdiction over defendants OWB-USA and NuStar pursuant to 28 U.S.C. § 2361.

11.     This Court has personal jurisdiction over ING to the extent it is or may be a third-party beneficiary of the bunker supply contracts at issue in this action and/or to the extent it is an alleged assignee of the receivables of defendants OWB-ME and OWB-USA.  In addition, ING is subject to personal jurisdiction since it transacts business within the jurisdiction of this Court and has a place of business at 1325 Avenue of the Americas, New York, New York 10019.

12.     Venue is proper in this Court under 28 U.S.C. § 1397.

**Nature of Action**

13.     This is an action for interpleader with respect to the principal sum of $340,048.06, representing the amount due for the supply of a specific and finite quantity of bunkers (marine fuel) to the Vessel in the Port of Houston, Texas on October 21, 2014 (the "Fuel Delivery").  SK Shipping and SK Bunkering stand ready, willing and able to pay the Disputed Funds but OWB-USA, OWB-ME, NuStar, ING and/or some third party(ies) may have conflicting claims as to the ownership of the payment due from SK Shipping and/or SK Bunkering.  Without guidance from the Court, SK Shipping and SK Bunkering cannot make

payment to any single defendant without risking competing claims by the other defendants, and/or by other third parties, which claims present the threat of imminent arrest, attachment, seizure or judicial detention of the Vessel, with a resulting claim by the Owner of the Vessel against SK Shipping for damages resulting from an alleged breach of the time charter described in paragraph 1 above.

## Factual Background

14.     On or about October 2, 2014, SK Bunkering contracted with OWS-ME to provide 510.00 metric tons of marine fuel oil and gasoil to the Vessel when it called at Houston, Texas on a date between October 16 and October 20, 2014.  A true and correct copy of the OWB-ME Sales Order Confirmation no. 199-12287 is attached hereto as Exhibit A.

15.     The "Terms" of the OWB-ME Sales Order Confirmation contain a term which provides as follows:

> The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as 'Buyer' and to O. W. Bunker USA Inc. as 'Seller'. The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address: http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013. pdf.

*See* Exhibit A.

16.     At the time in question, the OW Bunker Group Terms and Conditions of Sale for Marine Bunkers Edition 2013 ("OW Group Terms and Conditions") could be found at OW Bunker Group's worldwide web address provided in the preceding paragraph.  Paragraph P of the OW Group Terms and Conditions provides that English law shall apply to the bunker supply

contract and that all disputes arising in connection with the contract shall be resolved at arbitration in London, England in accordance with the Arbitration Act 1996 (or any subsequent amendment).  A true and correct copy of the OW Group Terms and Conditions is attached hereto as Exhibit B.

17.     Notwithstanding the governing law and forum selection clause set forth in Paragraph P of the OW Group Terms and Conditions, Paragraph L.4(a) thereof provides as follows:

> These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions.  In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third-party.

*See* Exhibit B.

18.     In instances in which the physical supply of bunkers is undertaken by a third party whose terms specify a forum for dispute resolution different than the London arbitral forum set forth in Paragraph P of the OW Group Terms and Conditions, then Paragraph L.4(b)(ii) further provides as follows:

> Without prejudice or limitation to the generality of the foregoing, in the event that the third-party terms include: … a different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms and conditions.

*See* Exhibit B.

19.     Upon information and belief, after reaching its sales agreement with SK Bunkering, OWB-ME thereupon contracted with OWB-USA to supply the fuel to the Vessel. Thereafter, OWB-USA, either on its own behalf or as agent for OWB-ME, contracted with

NuStar to have the latter supply the fuel to the Vessel at Houston.  The agreement between OWB-USA and NuStar was evidenced in a Sales Agreement dated October 2, 2014 between NuStar as "Seller" and "OW Bunker USA, Inc." as "Buyer" (the "NuStar Sales Agreement").  A true and correct copy of the NuStar Sales Agreement is attached hereto as Exhibit C.

20.     The NuStar Sales Agreement provided *inter alia* that NuStar agreed to sell and OWB-USA agreed to purchase the fuel "in accordance with the terms and provisions of this Sales Agreement and the General Terms and Condition incorporated herein by this reference." The NuStar Terms and Conditions of Sale for Marine Fuels contain a Houston jurisdiction clause but they also reserve NuStar's right "to arrest the BUYER's vessel or attach property of the BUYER whether said BUYER's vessel and property are within the United States of America or elsewhere."  A true and correct copy of the NuStar Terms and Conditions of Sale for Marine Fuels are attached hereto as Exhibit D.

21.     On or about October 21, 2014, and as reflected in a Marine Fuel Delivery Note dated October 21, 2014, NuStar supplied 601.05 metric tons of marine fuel to the Vessel.  A true and correct copy of the Bunker Delivery Note is attached hereto as Exhibit E.

22.     On or about November 4, 2014, NuStar issued its Invoice No. 90430732 dated October 29, 2014 in the amount of $304,898.77 to OWB-USA for NuStar's delivery of the fuel to the Vessel (the "NuStar Invoice").  A true and correct copy of the NuStar Invoice is attached hereto as Exhibit F.

23.     On or about October 21, 2014, OWB-ME issued its Invoice No. 199-141310 in the amount of $340,048.06 to SK Bunkering.  A true and correct copy of the OWB-ME Invoice is attached hereto as Exhibit G.

24.     Under the terms of the OWB-ME Invoice, payment for the fuel was due on or about November 19, 2014.

25.     On November 7, 2014, O.W. Bunker & Trading A/S and certain of its Danish subsidiaries and affiliates filed for bankruptcy protection in their home jurisdiction of Denmark. Thereafter, many other O.W. entities and/or affiliates filed for bankruptcy protection in various other jurisdictions around the world.  To date, no foreign O.W. bankruptcy proceeding has been recognized in the United States pursuant to Chapter 15 of the U.S. Bankruptcy Code.

26.     On November 13, 2014, and before payment was due under the OWB-ME Invoice, OWB-USA and two other O.W. Bunker entities ("the Debtors") filed Petitions seeking protection from their creditors under Chapter 11 of the U.S. Bankruptcy Code.  These Petitions are on file in the United States Bankruptcy Court for the District of Connecticut but the Debtors have filed motions in their respective bankruptcy cases seeking to have the venue of said proceedings transferred to the U.S. Bankruptcy Court for the Southern District of New York.

27.     Upon information and belief, it is thought that defendant OWB-ME is in liquidation and has ceased operating.

28.     Pursuant to an Omnibus Security Agreement dated December 19, 2013 between O.W. Bunker & Trading A/S and its subsidiaries (including OWB-USA and OWB-ME), as Chargors, and ING, as Security Agent, the O.W. entities have allegedly assigned all rights, title and interest in their third party and intercompany receivables as security to ING.

**POSSIBLE ARREST OF VESSEL - NECESSITY OF INTERPLEADER**

29.     Under United States maritime law, the contract supplier (such as OWB-ME and/or OWB-USA) of necessaries, including fuel, to a vessel obtains a maritime lien against that vessel.  Additionally, under certain circumstances, a physical supplier of the fuel (such as NuStar) may also assert a maritime lien on the vessel.  NuStar has indeed threatened to enforce a maritime lien against the AZURIT, which is essentially a vessel arrest threat.  See the email from NuStar's attorney at Blank Rome included as part of Exhibit H.

30.     Moreover, other parties, such as ING, have asserted a right to payment for the Fuel Delivery (see Exhibit I).  Upon information and belief, ING's claims are based on assignments of receivables by various O.W. entities including but not limited to OWB-ME and OWB-USA.

31.     Upon information and belief, the AZURIT is a tramp vessel that operates in worldwide commerce, depending on the orders and instructions of companies such as SK Shipping that charter the ship.  NuStar has already threatened to arrest the vessel.  Any such vessel detention will cause the vessel's registered owner to demand indemnification from SK Shipping and/or SK Bunkering, delay the Vessel, affect innocent third parties with interests in the Vessel's cargo and generally inhibit and interfere with maritime commerce.

32.     SK Bunkering presently has control over the funds invoiced for the Fuel Delivery to the Vessel.  Plaintiffs disclaim any interest in the amount invoiced for the supply of bunkers to the Vessel.

33.     SK Shipping and SK Bunkering cannot ascertain whether the amount owed for the Fuel Delivery should be paid to OWB-ME, OWB-USA, NuStar or ING in order to extinguish all

maritime liens and/or other claims against SK Bunkering and the Vessel and to prevent the Vessel's arrest or attachment in this District or elsewhere and to prevent double liability for the Fuel Delivery.

34.     The competing claims of the Defendants or other third parties will likely expose SK Bunkering and the Vessel to multiple liabilities in connection with the payment of the bunker invoices in order to extinguish competing maritime lien claims and/or other in personam or non-maritime claims.

35.     SK Bunkering, acting on behalf of the Vessel, is entitled to deposit with the Court the sum of at least $340,048.06 representing the amount due pursuant to the invoices issued by OWB-ME for the Fuel Delivery, and require that OWB-ME, OWB-USA, NuStar, ING and any other claimant interplead among themselves to establish their respective rights to the funds.

36.     Further, in order to comply with the requirements of Supplemental Admiralty Rule E(5)(a) and for the funds deposited into the Registry to constitute security for the *in rem* claims of the claimants and to act as the substitute *res* against which claimants must assert their maritime liens for the Fuel Delivery, Plaintiff SK Bunkering is prepared to deposit an additional amount ($20,402.88) constituting 6% interest per annum or such other amount as the court deems just and proper. Thus, the total amount of the proposed deposit is calculated to be $360,450.94, inclusive of one year of interest.

37.     The Vessel is similarly entitled to be discharged from any maritime lien against it arising from the Fuel Delivery as described herein and as reflected in Exhibits A, C, E, F and G.

WHEREFORE, plaintiffs SK Shipping Co., Ltd. and SK B&T Pte. Ltd. respectfully request that this Court:

1. Determine which of the defendants is entitled to the Fuel Delivery funds or, in the alternative, the share of each defendant, if any;

2. Enjoin O.W. Bunker Middle East DMCC, O.W. Bunker USA Inc., NuStar Energy Services Inc. and ING Bank, N.V. and any later-identified claimants from commencing any action against SK Shipping Co., Ltd. and SK B&T Pte. Ltd. or the vessel AZURIT *in rem*, including but not limited to the arrest or attachment of the Vessel in any port, pursuant to Supplemental Admiralty Rules C or B or otherwise based on the assertion of any *in rem* claim or *in personam* claim directed against SK Shipping and/or SK Bunkering for the provision of the bunkers referred to herein as the Fuel Delivery;

3. Discharge SK Shipping and SK B&T Pte. Ltd. from any liability on any claim that has been made or may in the future be made for the Fuel Delivery upon Plaintiff's deposit of $360,450.94 into this Court's registry, or such other amount the Court finds sufficient to discharge SK Bunkering and the M/V AZURIT from liability for the Fuel Delivery;

4. Discharge the Vessel from any liability on any claim that has been made or may in the future be made for the Fuel Delivery upon Plaintiffs' deposit of $360,450.94 into this Court's registry;

5. Award Plaintiffs their costs and attorneys' fees in this action;

6. Award the return of any amount remaining in the Registry (e.g., the interest deposit) to the Plaintiffs upon the ultimate disposition of claims to the deposited Fuel Delivery funds; and

**Interpleader Complaint**                                           **Page 11 of 12**

      7.  Award Plaintiffs such other and further or different relief as this Court may

deem just and proper.


Dated:    New York, NY
            March 20, 2015


                                   BURKE & PARSONS
                                   Attorneys for Plaintiffs
                                   SK Shipping Co. Ltd. and
                                   SK B&T Pte. Ltd.


                                   By:_____
                                    Keith W. Heard
                                   100 Park Avenue
                                   New York NY  10017-5533
                                   Telephone: (212) 354-3800
                                   Facsimile: (212) 221-1432
                                   Email: heard@burkeparsons.com


9442_0001_S03.DOCX

# EXHIBIT A

## O.W. Bunker Middle East DMCC
## Korea Division



SK B&T PTE.LTD
9 RAFFLES PLACE, #53-02
REPUBLIC PLAZA
SG-048619 Singapore
Republic of Singapore
Dr. Ian Eio

Indigo Tower, Office #709-710, Jumeirah
P.O.Box 486052, Dubai, UAE
United Arab Emirates
+82 70 7432 0000
+82 27770340
ING Bank N.V.
IBAN: NL67 INGB 0020 0143 76
IBAN: NL42 INGB 0650 0505 84
SWIFT: INGBNL2A

## Sales Order Confirmation

Korea   2. October 2014

**Sales Order No.**      **199-12287**

We are hereby pleased to acknowledge receipt of your order as follows:

| | |
|---|---|
| **Vessel** | AZURIT (IMO: 9551703) |
| **Port** | HOUSTON |
| **Delivery date** | Between 16. October 2014 and 20. October 2014 |
| **Seller** | O.W.Bunker Middle East (Dubai) |
| **Your ref.** | |
| **Account** | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV AZURIT AND/OR SK B&T PTE.LTD |

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 410,00 | MT | Fueloil 380-CST 3,5% | USD | 530,50 | MT | NUSTAR |
| 95,00 | MT | 380-CST 1% | USD | 574,00 | MT | NUSTAR |
| 5,00 | MT | Gasoil 0,1% | USD | 899,00 | MT | NUSTAR |

**Agent**

**Payment**      WITHIN 30 DAYS FROM DATE OF SUPPLY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX). COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME.

**Remarks**      8.20 USD/MT, minimum 8855.00 USD (HOUSTON, TX)
9.60 USD/MT, minimum 10385.00 USD (BARBOUR'S CUT, TX)
10.75 USD/MT, minimum 11625.00 USD (BAYPORT, TX)
10.75 USD/MT, minimum 11625.00 USD (GALVESTON, TX)
10.75 USD/MT, minimum 11625.00 USD (TEXAS CITY, TX)
13.25 USD/MT, minimum 14330.00 USD (BOLIVAR ROADS, TX - Weather Permitting)
18.20 USD/MT, minimum 19655.00 USD (FREEPORT, TX)

Plus 24% barging fuel surcharge

WHARFAGE FEES (0.30 USD/MT).
TERMINAL SEC FEES (0.045 USD/MT)
HARBOR FEES (32.00 USD)
PORT SEC FEES (13.25 USD)

**O.W. Bunker Middle East DMCC**
**Korea Division**



We thank you for this nomination.

Kind Regards

BK Kim

| | |
|---|---|
| Direct | |
| Mobile | +82 10 2704 0176 |
| Yahoo ID | bkkm_owbunker |
| E-Mail | bkkm@owbunker.com |
| Office E-Mail | korea@owbunker.com |

TERMS AND CONDITIONS.
----------------------------------------------

SAMPLES:

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any dispute regarding quality to be settled by testing these retained samples by an independent laboratory at port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

TERMS:

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as ´Buyer´ and to O.W.Bunker Middle East (Dubai) as ´Seller´.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

GUIDELINES FOR RECEIVING BUNKERS:

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard.Following the suggested Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

OTHERWISE:

Any errors or omissions in above Confirmation should be reported immediately.

PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR UNDERSTANDING.

# O.W. Bunker Middle East DMCC
## Korea Division



GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

BEFORE BUNKERING:

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge. If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified.

Make sure to witness and verify initial measurements and ullaging onboard the barge before. ALL tanks to be checked and measured including actual temperature of cargo – also including those tanks said not to be included in the particular supply (idle tanks). Compare measurements and verify the quantities as per barge ullage tables. When in full agreement please sign the ullage/sounding report for Before Supply figures. If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt).

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures.

DURING BUNKERING:

Always place a watchman to witness safe operation including also proper and correct sampling. The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling. Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples. Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes. All seal numbers to be inserted into the Bunker Delivery Receipt (BDR). The MARPOL sample must be one of these samples drawn under witnessing.

The watchman must pay special attention to the bunker hose, and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties. If air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain the time (hours from/to) that airblow was notified.

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply. Pay special attention hereto and take all necessary precautions to observe, which includes:
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging.
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge.
- Agree with the barge when and if they are going to make stripping of their tanks.
- Check and note the draft fore, mid and aft on the barge before and after supply to compare.
- If any signs at all of cappuccino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far.
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately.
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also.
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master.

AFTER COMPLETION:

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank. Make sure also on completion to verify contents of ALL tanks, including those being idle.

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor. If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply.

QUANTITY COMPLAINTS:

Receiving Vessel to inform discrepancies in writing latest upon completion of taking the bunkers.

# EXHIBIT B

# OW BUNKER GROUP

## Terms and Conditions of sale for Marine Bunkers
## Edition 2013

**A.       GENERAL INTRODUCTION**

A.1       This is a statement of the terms and conditions according to which the
          International O.W. Bunker Group (hereinafter called "OWB") will sell marine bunkers.

A.2       These conditions apply to all offers, quotations, orders, agreements, services and all subsequent
          contracts of whatever nature, except where otherwise is expressly agreed in writing by OWB.

A.3       General trading conditions of another party will not apply, unless expressly accepted in writing by OWB.

A.4       In the case that, for whatever reason, one or more of the (sub)clauses of these general conditions are
          invalid, the other (sub)clauses hereof shall remain valid and be binding upon the parties.


**B.       DEFINITIONS**

B.1       Throughout this document the following definitions shall apply:

"Seller"                      means OWB; any office, branch office, affiliate or associate of the OWB
                              Group; being the legal entity within the OWB Group, whose name is
                              included in the Order Confirmation, sent to the Buyer.

"Buyer"                       means the vessel supplied and jointly and severally her Master, Owners,
                              Managers/Operators, Disponent Owners, Time Charterers, Bareboat
                              Charterers and Charterers or any party requesting offers or quotations for
                              or ordering Bunkers and/or Services and any party on whose behalf the
                              said offers, quotations, orders and subsequent agreements or contracts
                              have been made;

"Bunkers"                     means the commercial grades of bunker oils as generally offered to the
                              Seller's customers for similar use at the time and place of delivery and/or
                              services connected thereto;

"Owner"                       means the registered Owner, Manager or Bareboat Charterer of the vessel;

"Vessel"                      means the Buyer's Vessel, Ship, Barge or Off-Shore Unit that receives the
                              supply/bunkers; either as end-user or as transfer unit to a third party;

"Nomination"                  means the written request/requirement by the Buyer to the Seller, for the
                              supply of the Bunkers;

"Order Confirmation"          means the written confirmation as issued by the Seller and forwarded to
                              the Buyer to conclude the conclusion of the negotiated sale/purchase of
                              the Bunkers. In case of conflict between the Nomination and the Order
                              Confirmation, unless the Seller otherwise agrees in writing, the wording and
                              content of the Order Confirmation is deemed contain the prevailing terms
                              of the Agreement;

"Agreement"                   means the concluded terms for the sale/purchase of the Bunkers;

"Supplier"                    means any party instructed by or on behalf of the Seller to supply or deliver
                              the Bunkers;

"GTC"                         means these General Terms and Conditions which shall govern the
                              contractual regulations between the Seller and the Buyer

"BDR"                         means the Bunker Delivery Receipt, being the document(s)  which is/are
                              signed by the Buyer's representative(s) at the place of the supply of the
                              Bunkers to the Vessel, evidencing the quality and quantity of the Bunkers
                              supplied to and received by the Vessel.


**C.       OFFERS, QUOTATIONS AND PRICES**

C.1       An Agreement shall only be concluded and binding on the Seller when the Seller sends the Order
          Confirmation to the Buyer. Each Order Confirmation shall incorporate these GTC by reference so that
          the GTC are considered a part of the Confirmation.

C.2       Agreements entered into via brokers, or any other authorised representative on behalf of the Seller, shall
          only bind the Seller upon the Sellers' broker or other authorised representative sending the Order
          Confirmation to the Buyer or the Buyer's broker as the case may be.

C.3       The Seller's offer is based on the applicable taxes, duties, costs, charges and price level of components
          for Bunkers existing at the time of the conclusion of the Agreement. Any later or additional tax,
          assessment, duty or other charge of whatever nature and however named, or any increase of
          components for Bunkers or any additional costs borne by the Seller whatsoever caused by any change
          in the Seller's contemplated source of supply or otherwise, coming into existence after the Agreement
          has been concluded, shall be added to the agreed purchase price, provided that the Seller shall give

the Buyer prior notice of this effect within a reasonable (under the prevailing circumstances) time after the Seller becoming aware of the relevant circumstances.

C.4    All prices and/or tariffs are exclusive VAT, unless specifically stated otherwise. Any VAT or other charge and/or tax applicable and whenever imposed, shall be promptly paid by the Buyer, and unless otherwise agreed in writing all supplies are quoted and invoiced based on quantity calculated quantity in metric tons in vacuum.

C.5    If the party requesting Bunkers is not the Owner of the Vessel, the Seller shall have the right (but will not be obliged) to insist as o precondition of sale that a payment guarantee is provided by the Owner. The Seller shall have the right (but will not be obliged) to cancel any agreement with the Buyer at any time, if such payment guarantee is not received upon request thereof from the Seller to the Owner. The Seller's decision to forego obtaining a payment guarantee under this Clause C.5 shall have no effect on Seller's right to a lien on the Vessel for any Bunkers supplied under this Agreement.

C.6    The Buyer warrants that it is authorized as agent to order Bunkers for the Vessel, and that the Seller has a lien on the Vessel for any Bunkers supplied under this Agreement. If the party requesting Bunkers is not the Owner of the Vessel, Buyer assumes the sole responsibility for communicating the terms and conditions of this Agreement to the Owner of the Vessel prior to the date of delivery.

C.7    If at any time before the delivery the financial standing of the Buyer appears to the Seller (in its absolute discretion) to have become impaired or unsatisfactory, the Seller may require cash payment or security to be provided by the Buyer prior to delivery, failing which the Seller may cancel the delivery without any liability on the part of the latter or its subcontractors.

**D.    SPECIFICATIONS (QUALITY – QUANTITY)**

D.1    The Buyer assumes the sole responsibility for the choice of nominating the quantity and quality of Bunkers and determine (if applicable) potential compatibility with any Bunkers already on board the Vessel. The Buyer also assumes sole responsibility for the selection and fitness of its choice of Bunkers for any particular use or purpose, and the Seller shall assume no responsibility whatsoever for the compliance or fitness of the Bunkers for a specific type of engine or equipment which the Buyer may or may not have agreed upon in any C/P (Charterparty) term or otherwise. This includes but is not limited to the quality, sulphur content and any other specific characteristics of the Bunkers whatsoever. Any and all warranties regarding the satisfactory quality, merchantability, fitness for purpose, description or otherwise, are hereby excluded and disclaimed.
Where specifications designate a maximum value, no minimum value is guaranteed unless expressly stated in the Order Confirmation, and conversely where minimum values are provided in o specification, no maximum values are guaranteed unless expressly stated in the Order Confirmation.

D.2    The quality and quantity shall be as agreed between the Seller and the Buyer and shall correspond to the Seller's Order Confirmation. Unless otherwise agreed in writing the Bunkers ore delivered and sold based on metric tons in vacuum.

D.3    Where standard specifications are being given or referred to, tolerances in accordance with ISO 4259 in respect of Reproducibility/Repeatability in quality are to be accepted without compensation or other consequences whatsoever.

D.4    In respect of the quantity agreed upon the Seller shall be at liberty to provide, and the Buyer shall accept a variation of 5% from the agreed quantity, with no other consequence than a similar variation to the corresponding invoice from the Seller.

D.5    Information regarding the typical characteristics of the Bunkers at any delivery location shall only be indicative of the Bunkers that have been made available at that location and shall not form a part of the specification of the Bunkers to be delivered. All grades of produce may contain petroleum industry allowed bio-derived components.

**E.    MEASUREMENTS – NON CLAUSING OF THE BDR(S)**

E.1    The quantities of bunkers shall be determined only from the official gauge or meter of the bunkering barge, tank truck or of the shore tank in case of delivery ex wharf.

E.2    The Buyer's representative shall together with the Seller's representative measure and verity the quantities of Bunkers delivered from the tank(s) from which the delivery is made. When supplied by bunkering barge/tanker the particular barge/tanker will present its tank calibration and ullage sounding records, which are agreed to be the sole valid and binding document(s) to determine the quantity or quantities supplied. Quantities calculated from the Receiving Vessel's soundings shall not be considered.

E.3         Should the Buyer's representative fail or decline to verify the quantities, the measurements of quantities made by the Seller or the Supplier shall be final, conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to any variance.

E.4         The Buyer expressly undertakes not to make any endorsement, complaint/ comment (including but without limitation any ''No-lien'' clausing) on the BDR when presented for signature by the Buyer's representative(s), any such insertion shall be invalid and of no effect whatsoever.

E.5         In the event of complaint/comment on the quantity of Bunkers delivered, the Buyer or the Master of the Vessel shall give to the Seller/Supplier a letter of protest separately, followed by a complaint in detail to the Seller, setting out the exact quantity(ies) claimed shortsupplied, and with full supporting vouchers, in writing within 7 (seven) days thereof, failing which, any such claim by the Buyer shall be extinguished as non existent, and the Buyer shall be deemed to have expressly waived any such claim against the Seller/Supplier, the relevant claim being time barred, and the Seller/Supplier's weight and measurements shall be conclusive evidence of the quantity of Bunkers delivered.

## F.         SAMPLING

F.1         The Supplier shall arrange for four (4) representative samples of each grade of Bunkers to be drawn throughout the entire bunkering operation. The Buyer's representative has the responsibility to witness that such samples are drawn  correctly and shall confirm his witnessing thereof and also confirm the proper and correct sealing by signing the labels of the sample bottles.

F.2         In case that dripsampling is not available onboard the barge, tanktruck or shore tank, samples shall be taken as a composite of each tank from which supplies are made, onboard the barge (respectively at the share tank or tanktruck), divided with 1/3 from each the top, mid and bottom of the tank.

F.3         The samples shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, product name, delivery date and place and seal number, authenticated with the Vessel's stamp and signed by the Seller's representative and the Master of the Vessel or his representative. The seal numbers shall be inserted into the BDR/Bunker Delivery Receipts, and by signing the BDR both parties agrees to the fact that the samples referred to therein are deemed valid and taken in accordance with the requirements as specified in this Chapter F.

F.4         Two (2) samples shall be retained by the Seller for ninety (90) days after delivery of the Bunkers, or if requested by the Buyer in writing, for as long as the Buyer reasonably required. The other two (2) samples shall be retained by the receiving Vessel, one of which being dedicated as the MARPOL sample.

F.5         In the event of a dispute in regard to the quality of the Bunkers delivered, the samples drawn pursuant to this Chapter F, shall be conclusive and final evidence of the quality of the Bunkers delivered. One, and only one, of the samples retained by the Sellers shall be forwarded to an independent laboratory to perform a set of tests, the result of which is to be made available to both parties. Those test results shall be final and binding upon both Buyer and Seller as to the parameters tested. The parties are to use best endeavours to agree the independent laboratory to perform the tests. If, however, no agreement can be reached on the choice of laboratory within 3 days of the Buyer being advised of the Seller opting to have the sample tested, the Seller is at liberty to send the sample to a reputable and independent laboratory of its choice for the tests to be conducted, and those test result will be final and binding upon Buyer and Seller as set out above.

F.6         The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present, or fails to be present at the appropriate time and place; and both parties shall have the right to appoint independent person(s) or surveyor(s) to witness the seal breaking.

F.7         No samples subsequently taken shall be allowed as (additional) evidence. If any of the seals have been removed or tampered with by an unauthorised person, such sample(s) shall be deemed to have no value as evidence.

F.8         Any eventual samples drawn by Buyer's personnel either during bunkering or at any later date after bunkering shall not be valid as indicator of the quality supplied. The fact that such samples may eventually bear the signature of personnel on board the barge or tank truck or other delivery conveyance shall have no legal significance as such local personnel have no authority to bind Seller to different contractual terms. Seller shall have no liability for claims arising in circumstances where Buyer may have commingled the products on board the Vessel with other fuels.

**G.**  **DELIVERY**

G.1   The time of delivery, os given by the Seller, has been given as an approximate time, unless it has been otherwise specifically agreed in writing between the parties.

G.2   The time of delivery will only be binding upon the Seller when all information necessary for the Seller to comply with its obligations hereunder, have been properly delivered to the Seller in reasonable time before the delivery. In the event the Nomination addresses a spread of dates for delivery, the Seller has the sole discretion to commence the delivery within any time, day/night/sshinc of these dates, always subject to the circumstances set out below in Clause G.3.

G.3   The Vessel shall under all circumstances be bunkered as promptly as the prevailing circumstances permit, having regard to congestion affecting the delivery facilities of Seller, its Suppliers or Agents and to prior commitments of barges or other delivery means. The Seller and/or the Supplier shall not be liable for any consequences or any time lost due to the Vessel having to wait for berth for bunkering or for completion of bunkering, and unless otherwise agreed in writing, the Seller shall not be obligated to deliver prior to the nominated date or spread of dates. The Seller is not responsible for delays caused by lacal customs, pilots, port- or other authorities.

G.4   In any case the Buyer, unless otherwise agreed in writing, must give not less than 72 (seventy two) hours approximate notice of readiness of the Vessel far delivery, which is to be followed by 48 (forty eight) hours and 24 (twenty four) hours such notices, where the last notice must also specify the exact place of delivery. All these notices must be given to the Sellers and the Seller's representatives/agents in writing.

G.5   The Seller shall be entitled to deliver the Bunkers by separate part deliveries, in which case each part delivery shall be construed as a separate delivery.

G.6   The Seller shall not be required to deliver any Bunkers if any customs and/or other government permit required for such purpose has not been obtained in due time before the delivery.

G.7   If the Seller at any time for any reason believes that there may be a shortage of supply at any place and that as a result thereof it may be unable to meet the demands of all its customers, the Seller may allocate its available and anticipated quantity/ies of Bunkers among its customers in such a manner as it may determine appropriate in its sole discretion.

G.8   The Vessel shall be accessible at all times to Seller and Supplier and shall be bunkered as promptly as the circumstances permit. The Seller and/or the Supplier shall not be liable for any demurrage paid or incurred by the Buyer or for any loss, damage or delay of the Vessel (consequential and/or liquidating damages included) of any nature whatsoever due to congestion at the loading terminal, prior commitments of available barges or tank trucks or any ather reason.

G.9   The Buyer shall ensure that the Vessel provides a free, safe and always afloat and accessible side for the delivery of bunkers and that all necessary assistance as required by the Seller or the Seller's representative is rendered in connection with the delivery. If in the Supplier's opinion clear and sofe berth is unavailable, delivery might be delayed or, in Seller's option, cancelled and all costs related to above will be an account of the Buyer.

G.10  The Vessel shall moor, unmoor, hoist and lower bunkering hase(s) from the barge(s) whenever required by the Seller, Seller's representative or Supplier, free of expenses and in any way as may be requested ta assist the barge equipment to a smooth supply. The Buyer shall make and be responsible far all connections and disconnections between the delivery hose(s) and the Vessel's bunker intake manifold/pipe and ensure that the hase(s) are properly secured to the Vessel's manifold prior to commencement of delivery.
During bunkering the Vessel's scuppers must be safely blocked, which blocking must be made by the Vessel's own crew. Furthermore the Vessel must ensure that all pipes and manifolds and receiving tanks are properly checked and ready to receive the bunkers, including but not limited to ensuring proper opening/closing at relevant vaives, without any risk for spillages, etc, during the bunkering.
Local further special requirements for receiving bunkers must be followed strictly by the Vessel, whether advised or not by the Seller or the Seller's representative, as it is always the Vessel and the Buyer who remains solely responsible for the knowledge and awareness of such eventual additional requirements for safety reasons.

G.11  In the event that the Vessel is not able to receive the delivery promptly, the Buyer is thereby in default and shall pay damages and/or any reasonable demurrage claim to the barging/supplying facilities and shall indemnify the Seller in each and every respect as a result thereof.

G.12  Delivery shall be deemed completed and all risk and liabilities, including lass, damage, deteriaration, depreciation, cantamination, evaporation or shrinkage to the Bunkers delivered and responsibility for loss, damage and harm caused by pollution or in any other manner to third parties shall pass to the Buyer

from the time the Bunkers reach the flange/connecting pipe line(s)/delivery hoses provided by the Seller on the barge/ tank truck/shore tank.

G.13     If the Buyer for whatever reason is unable or refuses to receive the full quantity ordered, the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the undelivered Bunkers back to the storage or by having to sell the Bunkers in a degraded form or at a lower price. The Seller may exercise this right without prejudice to the Seller's other rights for damages or otherwise pursuant to these conditions.

G.14     The Vessel shall provide and have appropriate and segregated tanks to receive the contracted quantity of Bunkers; and the Vessel shall always be able to perform its own blending on board if any blending is deemed to be required by the Buyer. The Vessel shall upon delivery test the Bunkers supplied by running her engines or auxiliaries or equipment, for which the Bunkers are supplied, for a minimum of 1 (one) hour to determine that the Bunkers are satisfactory. In the event the Bunkers are not considered satisfactory, the Seller and Supplier are to be notified in writing immediately after such test period has expired. Otherwise, it shall be deemed that the Bunkers were satisfactory and that in any event the Buyer has waived any right to claim in this regard.

G.15     If delivery is required outside normal business hours or on local weekends, Saturday, Sunday, national religious or public holidays the extra expenses incidental to such delivery shall be reimbursed by the Buyer as additional costs.

G.16     In the event the Bunker delivery is made by vessel or barge as a ship-to-ship transfer, any damage caused by contact and/or collision and/or swell and/or other weather or sea related condition or incident, is to be dealt with by the Owners directly with the owners of the units involved, and Seller/Supplier shall not be held nor be responsible for any such damages. If, however, any of the involved units choose to pursue Seller and/or Supplier, Buyer will fully indemnify and hold Seller harmless in relation thereto.

G.17     For safety reasons it is agreed that it is solely the Master of the bunkering barge that determines whether mooring alongside is safe, taking weather, swell and forecasts into consideration. Supplier/Seller not to be held responsible for any delays, demurrages, liquidating damages or similar whatsoever as a result of any eventual delays caused by any decision by the Master of the barge in this connection. Supplies being always performed weather permitting.

G.18     Without prejudice to any other article(s) herein, any and all supply/ies will be based on as per best endeavours only if the receiving Vessel arrives outside the originally agreed time split as per the Order Confirmation forwarded.

## H.     TITLE

H.1     Title in and to the Bunkers delivered and/or property rights in and to such Bunkers shall remain vested in the Seller until full payment has been received by the Seller of all amounts due in connection with the respective delivery. The provisions in this section are without prejudice to such other rights as the Seller may have under the laws of the governing jurisdiction against the Buyer or the Vessel in the event of non-payment.

H.2     Until full payment of the full amount due to the Seller has been made and subject to Article G.14 hereof, the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller, and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel, nor mix, blend, sell, encumber, pledge, alienate, or surrender the Bunkers to any third party or other Vessel.

H.3     In case of non or short payment for the Bunkers by the Buyer, the Seller is entitled (but not obliged) to repossess the Bunkers without prior juridical intervention, without prejudice to all other rights or remedies available to the Seller.

H.4     In the event that the Bunkers have been mixed with other bunkers on board the Vessel, the Seller shall have the right to trace its proprietary interest in the Bunkers into the mixed bunkers and/or a right of lien to such part of the mixed bunkers as corresponds to the quantity or net value of the Bunkers delivered.

H.5     The provisions of this Chapter H do not prejudice or in any way limit the Seller's right to arrest/attach the Vessel and/or sister ship and/or any sister or associate ship and/or other assets of the Buyer (or the Owner of the Vessel or any other party liable), wherever situated in the world, without prior notice.

H.6     Where, notwithstanding these conditions, title in and to the Bunkers delivered has passed to the Buyer and/or any third party before full payment has been made to the Seller, the Buyer shall grant a pledge over such Bunkers to the Seller. The Buyer shall furthermore grant a pledge over any other Bunkers present in the respective Vessel, including any mixtures of the delivered Bunkers and other bunkers. Such pledge

will be deemed to have been given for any and all claims, of whatever origin and of whatever nature that the Seller may have against the Buyer.

H.7       For the avoidance of doubt, where a mortgagee bank enforces any rights against the Vessel and becomes a mortgagee in possession of the Bunkers then as bailee the mortgage bank is liable to the Seller for fulfilment of the Agreement.

## I.       PAYMENT ~ MARITIME LIEN

I.1       Payment for the Bunkers and/or the relevant services and/or charges shall be made by the Buyer as directed by the Seller within the period agreed in writing.

I.2       Payment shall be made in full, without any set-off, counterclaim, deduction and/or discount free of bank charges to the bank account indicated by the Seller on the respective invoice(s).

I.3       (i) If at any time after delivery but before the due date the financial standing of the Buyer appears to the Seller (in its sole discretion) to have become impaired or unsatisfying, the Seller may require immediate full payment of all its invoices due and/or those not yet due, or such security as it shall deem to be satisfactory.
(ii) In the event that the Buyer shall default in making any payment due, the Seller may suspend deliveries of Bunkers until such payment has been made in full (together with default/delay compensation and costs), or the Seller may, in its discretion, elect to treat such default as a serious breach of the Agreement and thereupon terminate the Agreement on whole or in part without prejudice to any claim against the Buyer for damages, including cancellation charges. Such termination or suspension shall not relieve the Buyer of any obligation undertaken by virtue of an Agreement so terminated.
(iii) Where the Seller has extended any kind of credit facility to a group of companies or associated companies, default by any one relevant Buyer in respect to any invoice of the Seller shall give the right to the Seller to cancel all credit arrangements of the entire group or of all the associates, whereupon sub-clauses I.3.(i) and I.3.(ii) shall apply as appropriate.
(iv) Where the Buyer fails to pay timely, the Seller has the right to (without prejudice to its rights to receive default/delay compensation) take all appropriate steps to secure and enforce its claim; the Seller may also unilaterally cancel any credit arrangements agreed with/extended to the Buyer.
(v) All judicial and extrajudicial costs and expenses, including pre-action costs, fees, expenses and disbursements of the Seller's lawyers/attorneys-at-law, incurred in connection with non payment or delayed payment or by any other breach by the Buyer of these conditions, shall be for the Buyer's account, immediately payable by the latter to the Seller. In case of litigation, the Buyers shall also pay all the relevant expenses to the Seller, including but without limitation all his reasonable attorneys/lawyers' fees, costs and disbursements.

I.4       Payment shall be deemed to have been made on the date of which the Seller has received the full payment and such is available to the Seller. If payment falls due on a non-business day, the payment shall be made on or before the business day nearest to the due date. If the preceding and the succeeding business days are equally near to the due date, then payment shall be made on or before the preceding business day.

I.5       Any delay in payment of the full sum due shall entitle the Seller to interest at,  the rate of 3 (three) per cent per month (compounded monthly for each month [or part thereof] of non payment) without prejudice to any rights or remedies available to the Seller. Furthermore the Seller is entitled to charge a delayed payment administration fee of USD 1.50 per mton supplied, or the equivalent thereof in local currency, with a minimum administration fee of USD 350.00 for each delivery mode. All reasonable attorneys' fees incurred by Seller in connection with the collection of overdue payments shall be for the sole account of the Buyer.

I.6       Payments made by the Buyer in respect of a supply of Bunkers shall at all times be credited in the following order: (1) costs of any kind or nature, including but not limited to legal costs and attorneys' fees, (2) interest and administrational fee, and (3) invoices in their order of age, also if not yet due, or in Seller's sole discretion to specify a payment to any such invoice Seller considers relevant.

I.7       All costs borne by the Seller in connection with the collection of overdue payments, including those of the Seller's own legal and credit department and, including but not limited to, reasonable attorneys' fees, whether made in or out of court and in general all costs in connection with breach of any agreement by the Buyer, including but not limited to reasonable attorneys' fees, shall be for the sole account of the Buyer.

I.8       The Seller shall at all times, in its absolute discretion, be entitled to require the Buyer to provide the Seller what the Seller deems to be proper security for the performance of all of Buyer's obligations under the Agreement. Failing the immediate provision of such security upon Seller's demand, the Seller shall be

entitled to stop any further execution of any agreement(s) between the parties until such time as the Buyer has provided the required security.

I.9         Where Bunkers are supplied to a Vessel, in addition to any other security, the Agreement is entered into and the Goods are supplied upon the faith and credit of the Vessel. It is agreed and acknowledged that the sale of Bunkers to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Bunkers (and all interest and costs payable in respect thereof; including but not limited to the reasonable attorney's fees), such maritime lien afforded to the Seller over the Vessel. In any event any applicable Law shall not prejudice the right of the maritime lien of the Seller afforded hereunder or by any other applicable Law, be it of the place of delivery, or the flag of the Vessel, or the place of jurisdiction and/or an arrest of the Vessel, or otherwise howsoever.

I.10        It is mutually agreed that the Bunkers provided by the Seller to the Buyer under the terms of this Agreement have been ordered by the Buyer in the ordinary course of business between Seller and Buyer. All payments from Buyer to Seller for Bunkers supplied under this Agreement are deemed to have been made in the ordinary course of business between Seller and Buyer, according to these ordinary business terms agreed between them.

## J.         CLAIMS

J.1         In addition to the obligations referred to in Article E.4 and E.5 herein, any claim in connection with the quantity of the Bunkers delivered must be notified by the Buyer, or the Master of the Vessel, to the Seller or Supplier immediately after completion of delivery in the form of a letter of protest. If the Buyer or the Vessel's Master fails to present such immediate notice of protest to the Seller or Supplier, such claim shall be deemed to have been waived and shall be absolutely barred for all purposes.

J.2         Always without prejudice to Article G.14 herein, any and all claims concerning the quality of the Bunkers delivered or time consumed for the entire operation, shall be submitted to the Seller in writing within 15 (fifteen) days after delivery with a clear statement as to the nature or the claim(s) along with appropriate supporting documentation, failing which any rights to complain or claim compensation of whatever nature shall be deemed to have been waived and absolutely barred for all purposes.

J.3         The Buyer shall be obliged to make payment in full and fulfil all other obligations in accordance with the terms of the Agreement and these conditions, whether or not it has any claims or complaints. If Buyer submits a claim against Seller with respect to the quality or quantity of the products supplied, the Seller or the Seller's nominated representative shall be entitled to board the Vessel and investigate the Vessel's records, log books, engine logs, etc, and to make copies of any such document the Seller or the Seller's nominated representative may consider necessary for its investigations connected to the case. The Buyer shall allow this, or where Buyer has chartered the Vessel then the Buyer shall obtain authorization from Owner to allow the herein stated steps and to provide full assistance and support by the Vessel's officers and crew in any such manner the Seller or Seller's nominated representative may require. Failure to allow boarding and/or produce required copies of documents and/or lack of full cooperation by the Vessel's officers and crew shall constitute a waiver of the Buyer's claim.

J.4         The Seller shall be allowed, and the Buyer, Owner, Officers and Crew onboard the receiving Vessel shall agree and in any way support and cooperate with Seller's representative, to draw samples from the Vessel's storage tanks, settling tanks and service tank and/or from before and after the Vessel's centrifuges to have extra tests carried out for such samples at independent laboratory.

J.5         In each and  every case, any and all claims of the Buyer shall be timebarred unless arbitration/legal proceedings have been commenced/issued at the competent tribunal/court set forth in Chapter P hereof and served within 12 (twelve) months from the date of delivery of the Bunkers, or the date that delivery should have commenced pursuant to the Order Confirmation from the Seller.

## K.         LIABILITY – LIMIT TO SELLER'S LIABILITY

K.1         The Seller and/or Supplier shall not be liable for damages of whatever nature, including physical injury, nor for delay of delivery of Bunkers or services, no matter whether such damages or delay have been caused by fault or negligence on the side of the Seller. The Seller shall furthermore not be liable for damages or delay as described above when such damages or delay have been caused by the fault or negligence of its personnel, representatives, Supplier or (sub)contractors.

K.2         Liabilities of the Seller for consequential and/or liquidated damages including but not limited to loss of time, loss of cargo or charter cancelling date, loss of income or profit/earnings, are excluded. In any event and notwithstanding anything to the contrary herein, liability of the Seller shall under no

circumstances exceed the invoice value of the Bunkers supplied under the relevant agreement to the relevant Vessel.

K.3     The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred on the Seller due to a breach of contract and/or fault or neglect of the Buyers, its Supplier, agents, Servants, (sub)contractors, representatives, employees and the officers, crews and/or other people whether or not on board of the Vessel(s). The Buyer furthermore undertakes to hold the Seller harmless in case of any third party institutes a claim of whatever kind against the Seller whether direct or indirect relation to any agreement regulated by these terms and conditions. Third party shall mean any other (physical or legal) person/company than the Buyer.

K.4     No servant, supplier or agent of the Seller/Supplier (including independent (sub)contractors from time to time employed by the Seller/Supplier) shall be liable to the Buyer for loss, damage or delay, while acting in the course of or in connection with its employment and/or agency for the Seller. Without prejudice to the above every exemption, limitation, condition and liberty herein contained, and every right, exemption from or limit to liability, defence or immunity of whatever nature applicable to the Seller or to which it is entitled hereunder shall also be available and shall extend to protect every such servant, representative or agent of the Seller and/or the Supplier acting as aforesaid.


## L.     EXEMPTIONS AND FORCE MAJEURE

L.1     Neither the Seller nor the Seller's Supplier shall be liable for any loss, claim, damage, delay or demurrage due to any delay or failure in their performance under this Agreement (a) by reason of compliance with any order or request of any government authority, or person purporting to act therefore, or (b) when supply of the Bunkers or any facility of production, manufacture, storage, transportation, distribution or delivery contemplated by the Seller or Supplier is interrupted, delayed by congestion or other event (also see Article G.3 above), or by unavailability of product and/or barge equipment or by inadequate resource for any cause whatsoever which interruption, delay, unavailability or inadequate resources is not within the immediate control of the Seller or the Supplier, including (without limitation) if such is caused wholly or partly by labour disputes, strikes, stoppages, lock-out, governmental intervention, wars, civil commotion, riot, quarantine, fire flood, earthquake, accident, storm, swell, ice, adverse weather or any act of God. Neither the Seller nor the Supplier shall be required to remove any such cause or replace any affected source or supply or facility if doing so shall involve additional expense or a deviation from the Seller's or the Supplier's normal practices. Neither the Seller, nor the Supplier shall be required to make any deliveries which fail in whole or in part as a result of the causes set out in this Article at any later time.

L.2     If the Buyer exercises reasonable diligence, the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure. The Buyer shall indemnify the Seller or the Seller's supplier for any damage caused by the Buyer, the Buyer's agent or employees in connection with deliveries hereunder.

L.3     Declaration of Force Majeure shall be given without unduly delay once such event(s) have come to the knowledge of the respective party declaring same. However, under no circumstances and for no reason whatsoever, can Force Majeure entitle the Buyer not to pay promptly any invoice of the Seller.

L.3     In the event that the Seller, as a result of force majeure, can only deliver a superior grade of bunkers, the Seller is entitled to offer the said grade, and the Buyer must accept delivery thereof and pay the applicable price.

L.4     (a)     These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions.  In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.

        (b)     Without prejudice or limitation to the generality of the foregoing, in the event that the third party terms include:

        (i)     A shorter time limit for the doing of any act, or the making of any claim, then such shorter time limit shall be incorporated into these terms and conditions.

        (ii)     Any additional exclusion of liability clause, then same shall be incorporated mutatis mutandis into these.

        (ii)     A different law and/or forum selection for disputes to be determined, then such law selection and/or forum shall be incorporated into these terms and conditions.

(c)   It is acknowledged and agreed that the buyer shall not have any rights against the Seller which are greater or more extensive than the rights of the supplier against the aforesaid Third Party.

## M.        BREACH/CANCELLATION

M.1        Without prejudice to any other remedies and rights, the Seller shall have the option immediately to cancel the Agreement in full or in part, or to store or procure the storage of the Bunkers, in whole or in part, for the account and risk of the Buyer and to charge the Buyer the expenses thereby incurred, or to hold the Buyer fully to the agreement, or take any other measures which the Seller deems appropriate, without prejudice to its rights of indemnification, without any liability on the side of the Seller, in any one of (but not limited to) the following cases:

a)           when the Buyer, for whatever reason, fails to accept the Bunkers in part or in full at the place and time designated for delivery;

b)           when the Buyer fails in part or in full to comply with its obligations to pay any amount due to the Seller and/or provide security as set out in these GTC;

c)           when, before the date of delivery, it is apparent in the opinion of the Seller that the financial position of the Buyer entails a risk to the Seller;

d)           when, in case of force majeure, the Seller is of the opinion that the execution of the agreement should be cancelled.

M.2        The Seller may terminate any Agreement with the Buyer in whole or in part, in its full discretion, upon the breach of any provisions hereof by the Buyer or in the event that the Buyer fails to make or suspends payment, ceases to carry on business, makes an arrangement with its creditors or undergoes any form of bankruptcy, administration, re-organisation or asset rearrangement.

M.3        The Seller has the option to immediately cancel the Agreement for the account and risk of the Buyer if at any time the Seller, in its sole discretion, has reasonable grounds to believe that:

a)           The Vessel; or
b)           The Charterer of the Vessel; or
c)           The fully or partly Owner(s) of the Vessel; or
d)           Any officers of the Vessel; or
e)           The Operator and/or Manager of the Vessel; or
f)           Any other person or entity in any way related to the Agreement or delivery is/are
1)    Iranian(s); or
2)    Related in any way to Iran or Iranians; or
3)    Listed on the US OFAC Specially Designated Nationals List; or
4)    Covered by any US, UN- and/or EU sanctions; or
5)    Covered by any sanctions of any other jurisdiction and/or administration.

Under no circumstances can the Seller be held liable for any loss, delays, claims or damages of whatever kind suffered by the Buyer due to a cancellation under this Article.

The Buyer must inform the Seller immediately the Buyer becomes aware of or has reasons to believe that any of the above items a) to f) in combination with any of the above items 1) to 5) are fulfilled/apply. Should the Buyer breach its obligation to inform the Seller, the Buyer shall fully indemnify and keep the Seller harmless for any damage or loss caused by such breach, including consequential or liquidated damages.

M.4        The Buyer acknowledges that any agreements with the Seller and any actions related to such agreements as well as any interaction with third parties related to such agreements are covered by certain anticorruption laws and regulations which can include any anticorruption law, including but not limited to the U.S. Foreign Corrupt Practices Act ("FCPA"), and the UK Bribery Act.  Therefore, the Buyer declare to comply with all applicable anticorruption laws and regulations and agrees that the Buyer has not, and will not, not, offer, promise, pay, or authorize the payment of any money or anything of value, or take any action in furtherance of such a payment, whether by direct or indirect means, to any public official or private individual to influence the decision of such person in the performance of his duties to a government or to his company. Any breach of this clause will void the related Agreement and in the sole discretion of the Buyer any other Agreement between the parties, making any claims for payment, delivery or any other obligation of the Seller under this Agreement void. The Buyer is liable for all and any costs or losses incurred by the Seller due to such breach and/or an Agreement becoming void as a consequence.

## N.        SPILLAGE, ENVIRONMENTAL PROTECTION

N.1        If a spill occurs while the Bunkers are being delivered, the Buyer shall promptly take such action as is necessary to remove the spilled Bunkers and mitigate the effects of such spill. Without prejudice to the

generality of the foregoing the Seller is hereby authorised by the Buyer in the absolute discretion of the Seller, but at the expense of the Buyer, to take such measures and incur such expenses (whether by employing its own resources or by contraction with others) as are necessary in the judgment of the Seller to remove the spilled Bunkers and mitigate the effects of such spill. The Buyer shall cooperate and render such assistance as is required by the Seller in the course of the action. All expenses, claims, costs, losses, damages, liability and penalties arising from spills shall be borne by the party that caused the spill by a negligent act or omission. If both parties have acted negligently, all expenses, claims, losses, damages, liability and penalties, shall be divided between the parties in accordance with the respective degree of negligence. The burden of proof to show the Seller's negligence shall be on the Buyer. The Buyer shall give the Seller all documents and other information concerning any spill or any programme for the prevention thereof that is required by the Seller, or is required by law or regulation applicable at the time and place of delivery.

## O.        DELAYS AND CANCELLATIONS

O.1         Notwithstanding anything else to the contrary herein, and without prejudice to any rights or remedies otherwise available to the Seller, the Buyer, by its acceptance of these conditions, expressly agrees that Seller has the sole discretion to cancel or to adjust prices in the event the Vessel is suffering a delay exceeding 24 hours from the (last) nomination date.

O.2         If the Buyer for whatever reason (including circumstances entirely outside Buyer's control) cancels the Agreement, where Order Confirmation has been sent by Seller, the Buyer shall be liable for any and all losses suffered and liabilities incurred by the Seller and/or the Supplier as a result of such cancellation, including, but not limited to, barge costs, re-storing of the Bunkers, and hedging costs, and also in Seller's sole option any difference between the contract price of the undelivered product and the amount received by the Seller upon resale to another party or, if another buyer cannot be found, any market diminution in the value of the product as reasonably determined from available market indexes. These losses and liabilities shall be indemnified by a minimum amount of USD 4,000 by way of agreed minimum liquidated damages, and shall be indemnified in full if they in total exceed USD 4,000.

## P.        LAW AND JURISDICTION

P.1         This Agreement shall be governed and construed in accordance with English law.
            The 1980 United Nations Convention on Contracts for the International Sale of Goods (CISG) shall not apply.
            Except for circumstance referred to in Clause P.5 below all disputes arising in connection with this Agreement or any agreement relating hereto, save where the Seller decides otherwise in its sole discretion, shall be finally settled by arbitration in London, England in accordance with the Arbitration Act 1996 (or any subsequent amendment).

P.2         In the event that the Seller determines to refer any dispute to arbitration it shall be referred to a tribunal of three arbitrators consisting of one arbitrator to be appointed by the Seller, one by the Buyer, and one by the two arbitrators already appointed. Each member of the tribunal shall be a full member of The London Maritime Arbitrators Association (the ''LLMA''). Either party may call for Arbitration by service of written notice, specifying the name and address of the arbitrator appointed and a brief description of the dispute(s) or difference(s) to be the subject or the Arbitration. If the other party does not within 14 days serve notice of appointment of an arbitrator to arbitrate the dispute(s) or difference(s), then the first moving party shall have the right without further notice to appoint its own arbitrator as sole arbitrator and shall subsequently advise the other party accordingly. The award of the sole arbitrator shall be binding on both parties as if he had been appointed by agreement.  Provided each party appointed their own arbitrator then these two arbitrators shall jointly appoint the third arbitrator. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either party may apply to the English courts for the appointment of a third arbitrator.
            Any disputes to be referred to Arbitration are to be determined in accordance with the current LMAA terms unless the parties agree otherwise.

P.3         Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

P.4         In cases where neither the claim nor any counterclaim exceeds the amount of USD 100,000 (or such other sum as the parties may agree) the Arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

P.5         The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Seller shall be entitled to assert

its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any jurisdiction where the Vessel may be found.

Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim arisen in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York.

P.6     If any procedure of any nature whatsoever is instituted under Clause P.5 above, in connection with any controversy arising out of this Agreement or to interpret or enforce any rights under this Agreement, the prevailing party shall have the right to recover from the losing party its reasonable costs and attorneys' fees incurred in such proceeding.

**Q.      VALIDITY**

Q.1     These terms and conditions shall be valid and binding for all offers, quotations, prices and deliveries made by the O.W. Bunker Group, any associated company, representative or agent as of September 1, 2013, or at any later date.

Q.2     These terms and conditions are available at the website www.owbunker.com, on which site as well the Sellers may notify amendments, alterations, changes or verifications to same. Such amendments, alterations, changes or verifications are deemed to be a part of the entire terms once same have been advised on the website.

# EXHIBIT C



NuStar Energy Services Inc.
PO BOX 781609
San Antonio TX. 78248

## SALES AGREEMENT

| Organizational Data | | Contract Terms | |
|---|---|---|---|
| Deal Sheet No.: | 20151449 | Payment Terms: | WIRE 30 CAL DAYS FROM DELIVERY |
| Contract No.: | 40213047 | Interest of 18% per annum will apply to late payments | |
| Sold to: | 109364 | Vessel: | AZURIT |
| | O.W. BUNKER USA, INC | ETA Date: | 10/16/2014 00:00:00 to 10/20/2014 00:00:00 |
| | 2803 AUGUSTA DRIVE | Port: | HOUSTON |
| | Houston, TX 77057 | Agent: | WILHELMSEN |
| | | Broker: | |
| | | Nomination Date: | 10/02/2014 |

NuStar Energy Services Inc. ("Seller") agrees to sell and deliver, and O.W. BUNKER USA, INC ("Buyer"), agrees to purchase, receive, and pay for the following product(s) in accordance with the terms and provisions of this Sales Agreement and the General Terms and Conditions incorporated herein by this reference. Copy available upon request.

### NOTES
OW OCT REGULAR CONTRACT

### ITEM 000010
| | |
|---|---|
| Material | IFO380      Intermediate Fuel Oil 380 |
| Quantity | 410.000 MT |
| Formula Pricing Information | 100 % PLATT'S CLOSE / SETTLEMENT PUAFZ00 NO 6 3.0 USGC WATER |
| Diff Price | + 0.960000/BB6 |
| Item Note: | |

### ITEM 000020
| | |
|---|---|
| Material | IFO380LS    Low Sulfur IFO380 |
| Quantity | 95.000 MT |
| Formula Pricing Information | 100 % PLATT'S CLOSE / SETTLEMENT PUAFZ00 NO 6 3.0 USGC WATER |
| Diff Price | + 7.750000/BB6 |
| Item Note: | |

### ITEM 000030
| | |
|---|---|
| Material | MGO-DMA    Marine Gas Oil - DMA |
| Quantity | 5.000 MT |
| Rate | 895.000000 MT |
| Item Note: | |

### SECONDARY CHARGES
| | | | | |
|---|---|---|---|---|
| Harbor fees-IFO | 32.000000 | US$ | per | 1 EA |
| Security fee | 0.044100 | US$ | per | 1 MT |
| Wharfage fee | 0.300000 | US$ | per | 1 MT |
| Barging + surcharge | 10.166000 | US$ | per | 1 MT |
| Barging + srchg(min) | 10,980.200000 | US$ | per | 1 EA |
| Harbor fees-MGO | 32.000000 | US$ | per | 1 EA |

Quality:
All fuel oil supplied is in accordance with specifications set by ISO 8217: 2010(E) and conforms to regulations 14 and 18 of Annex VI of MARPOL 73/78 unless otherwise noted.
Samples:
MARPOL sample will be taken in accordance with supplier's commercial sampling procedures.
Notes:
By accepting the above described bunkers, the purchaser agrees that it may not set off against the purchase price of the bunkers any sums the purchaser contends are owed to it by NuStar Energy Services Inc. for any reason.
**Sales And Use Tax Exemption:** Fuel sold under this agreement will be used to operate vessels in interstate or foreign commerce.  Any



NuStar Energy Services Inc.
PO BOX 781609
San Antonio TX. 78248

SALES AGREEMENT

vessel not operated in interstate or foreign commerce will be responsible for any and all taxes associated with the delivered bunker fuel.

# EXHIBIT D



NuStar Energy Services, Inc.

## TERMS AND CONDITIONS OF SALE
## MARINE FUELS

Version Dated: May 29, 2009

### 1.   DEFINITIONS:

In this Agreement (as such term is hereinafter defined), the following terms shall have the following meanings:

(a)   "the Agreement" means the Principal Terms, Part I hereof, these General Terms and Conditions, Part II hereof and any attachments, schedules, or exhibits to such documents

(b)   "barrel" or "bbl" means 42 U.S. standard gallons at 60° Fahrenheit.

(c)   "BUYER" means a party or parties obligated to buy Marine Fuel under the Agreement. Should Marine Fuel be ordered by the BUYER as an agent, BUYER shall refer to such agent, as well as the principal, and both shall be bound by and liable for all obligations as fully and as completely as if they were both the principal, whether such principal be disclosed or undisclosed, and whether or not such agent purports to contract as agent only.

(d)   "Delivery Date" means the date on which the Marine Fuel is to be delivered to the Vessel by the Seller.

(e)   "Delivery Point" means the place at which the Marine Fuel purchased by the BUYER is to be delivered to the Vessel.

(f)   "gallon" means a U.S. standard gallon of 231 cubic inches at 60° Fahrenheit.

(g)   "General Terms" means these NuStar Terminals, N.V. General Terms and Conditions of Sale for Marine Fuel.

(h)   "Marine Fuel" means the type(s), quantity(ies) and commercial grade(s) of bunker fuel oil, intermediate fuel oil ("IFO"), marine diesel oil ("MDO"), marine gas oil ("MGO") and/or other materials or petroleum products specified in the Principal Terms which the SELLER has agreed to sell to the BUYER.

(i)   "metric ton" or "MT" means a total of 2204.6234 pounds avoirdupois.

(j)   "Principal Terms" means any form of agreement, including, without limitation, a letter or telex which to any extent incorporates by reference or is subject to the General Terms; and

(k)   "SELLER" means NuStar Terminals Marine Services, N.V., or it's designated affiliated company.

(l)   "Vessel" means the marine vessel or vessels to which the Marine Fuel purchased by the BUYER is to be delivered.

### 2.   QUALITY OF MARINE FUEL:

The BUYER shall have the sole responsibility for the selection and acceptance of Marine Fuel, including determination of compatibility with Marine Fuel already on board the Vessel, for use in the Vessel. The BUYER may appoint an inspector to analyze Marine Fuel delivered hereunder before it is pumped out to the SELLER's shore tanks and/or delivery vessel, provided BUYER gives SELLER no less than 48 hours notice so that appropriate security clearances can be made.  Unless otherwise indicated to the BUYER in writing by the SELLER, any information provided to the BUYER regarding the characteristics of Marine Fuel at any delivery location shall not be construed as specifications of the Marine Fuel to be delivered hereunder, but only as indications of the characteristics of the

Marine Fuel that has been available at that location from time to time.  SELLER will advise latest sulphur content basis tank analysis results.

Three (3) commercial samples of the Marine Fuel shall be taken at the time of delivery from either the delivery vessel's manifold or SELLER's pipeline flange and immediately sealed. Two (2) additional samples will be taken in accordance with MARPOL requirements and will used solely for verifying conformity with Annex VI of MARPOL 73/78, not for commercial or any other purposes. The aforementioned samples shall be taken by one of the following three methods: 1) manual valve-setting continuous-drip sampler; or 2) time-proportional automatic sampler; or 3) flow-proportional automatic sampler.  One (1) sealed sample of the commercial sample and one (1) sealed sample of the MARPOL sample shall be handed to the Vessel's Master, Chief Engineer or other officer, and the other samples shall be retained by the SELLER.  ANY AND ALL TESTS TO DETERMINE QUALITY SHALL BE MADE ONLY FROM SELLER'S RETAINED COMMERCIAL SAMPLE and shall be made in accordance with standard test methods specified in the official publications of either SPI, ASTM, or IP.  Other appropriate test methods may be used where no methods are prescribed in API, ASTM or IP publications on the date of this Agreement.

### 3.   MEASUREMENTS AND TEST:

Seller will take the measurements and make the calculations necessary to determine the quantity of Product delivered.  Such quantity shall be determined by calibrated meter on the pipeline or delivery vessel/barge or, if such is not available, calculating the difference between: the amount of Product in the delivering vessel/barge or shore tank before the transfer to the receiving Vessel; and the amount of Product in the delivering vessel/barge  or shore tank after the transfer to the receiving vessel. The amount of Product in the delivering vessel/barge before and after the transfer will be determined by: measuring the ullage in each compartment of the delivering vessel/barge by hand line; and using the strapping table for the delivering barge to convert the ullage measurements to Product quantities.  Calculations of the quantity of Product delivered that are based on the amount of Product in the receiving Vessel before or after the transfer will not consider by Seller nor will they be admissible as evidence in court.

A representative of the receiving vessel is invited to be present or Buyer may appoint a properly accredited surveyor to attend all measurements.  Absent manifest error, the SELLER's determination of quantity shall be conclusive.
All measurements shall be adjusted to barrels or metric tons at 60° Fahrenheit temperature.  All such adjustments shall be made in accordance with the latest Joint Petroleum Measurement Tables of the American Petroleum Institute ("API"), the American Society of Testing and Materials ("ASTM") and the Institute of Petroleum ("IP") designated API D-250.  ASTM D-1250 and IP 200/52, respectively.

### 4.   PRICE:

The price of Marine Fuel sold and delivered hereunder shall be the price set forth in the Principal Terms.  All prices for Marine Fuel wherever delivered are exclusive of all taxes, duties, fees or other assessments imposed or levied by any government authority (whether at the Delivery Point or otherwise) or instrumentality thereof and all port charges, if any.  Unless otherwise specified in the Principal Terms, price does not include the delivery charges for



NuStar Energy Services, Inc.

the Marine Fuel, and all such delivery charges shall be for the Buyer's account.

## 5.   PAYMENT TERMS:

Unless otherwise provided in the Principal Terms, all sales shall be on a cash in advance or irrevocable letter of credit basis. All letters of credit procured by the BUYER in favor of the SELLER shall be in form and substance acceptable to the SELLER and issued only by a bank acceptable to the SELLER.  Payment to the SELLER for all sales of Marine Fuel and all charges related thereto (including without limitation, delivery and any additional charges), if any, shall be made in full, without any right of set-off, discount or deduction. Payment shall be made in U.S. dollars by means of telegraphic transfer to the bank identified in the Principal Terms or in the SELLER's invoice, as the case my be, for deposit to the SELLER's account as specified therein.  Such transfer shall quote the SELLER's invoice or order number, the BUYER's name, the Vessel supplied and the SELLER's account number to which funds shall be deposited.

If the SELLER has extended credit to the BUYER, and if the applicable credit period expires on a Saturday, Sunday or any other day when the SELLER's bank is closed for business, then the BUYER shall arrange for the payment in question to be made within such shorter period as will enable the payment to have been made by the last day within the applicable credit period when the SELLER's bank was open for business. Delivery documents may be provided to the BUYER at its request, but payment shall not be conditioned upon the BUYER'' receipt of such documents.  Notwithstanding any disputes regarding quality, quantity or other matter, the BUYER must initially pay the full amount due, and any disputes shall be resolved between the parties after such payment has been made. SELLER may at any time, in its sole and absolute discretion, cancel any existing credit line granted to BUYER or refuse to extend credit to BUYER without notice.

## 6.   ADEQUATE ASSURANCE:

NuStar will establish and may, in its sole discretion, notify Buyer of any credit dollar amount (the "Credit Limit") that will be applicable to the Buyer.  The Credit Limit will be in such amount (including no amount) as Seller elects.  Seller may change the Credit Limit at any time and notify Buyer of any such change.

6.1  If at any time Buyer's Outstanding Indebtedness (as  defined below) exceeds the Credit Limit then in effect for Buyer, Buyer must reduce the Outstanding Indebtedness to any amount that is not greater than the Credit Limit then in effect for the Buyer by doing any, or any combination, of the following:  (i)   Paying to Seller an amount of the Outstanding Indebtedness; or (ii)  Providing to Seller a letter of credit in a form and from a bank both reasonably satisfactory to Seller under which Seller will be permitted to draw an amount that is not less than the amount by which the Outstanding Indebtedness exceeds the Credit Limit.

6.2  For the purposes of this Section 8, "Outstanding Indebtedness" means, as of any day during the term of this Agreement, all amounts due or which will become due to Seller under all agreements between Seller and Buyer for completed delivery, including, without limitation, this Agreement, where delivery of, but no payment for, products  have been made.  If Buyer has failed to (i) pay Seller for any amount that is due (if such failure has not subsequently been cured) or (ii) be in default of this

Agreement under Section 15 after expiration of applicable cure periods, then in addition to ceasing to deliver Product under the Agreement, and regardless of any payment terms then in effect for Buyer, Seller may declare all of the Outstanding Indebtedness to be due and payable and terminate this Agreement.

6.3   If Seller determines that the financial condition of Buyer has become impaired or unsatisfactory, Seller may require Buyer to provide Seller with satisfactory security or adequate assurances of performance. Seller's requirement for security or assurances may include changing the credit terms of this Agreement in which case Seller may require Buyer to:

(i) prepay by wire transfer at least by the first day that Buyer is open for business before Product delivery date the full estimated invoice amount under this Agreement, (ii) post at least two business days prior to Product delivery date a irrevocable, standby letter of credit, in form and substance specified by Seller, issued or confirmed by a bank acceptable to Seller, in an amount sufficient to cover the full estimated invoice amount under this Agreement or (iii) deliver to Seller at least two business days prior to Product delivery date a parent company guaranty in form and substance satisfactory to Seller of the prompt payment, when due, of any and all present or future indebtedness of Buyer as a result of any sale of Product under this Agreement.  The change in credit terms will be effective 30 days after Seller's written notice to Buyer that it is requesting such a change.  The exercise by Seller of any right under this paragraph is without prejudice to any claim for damages or any other right Seller may have under law.

## 7.   DELIVERIES:

Vessels will be bunkered as promptly as circumstances permit, but the SELLER shall not be liable under any circumstances for demurrage or for any loss due to delays or to prior commitments of available delivery vessels.  If a delivery permit is required from any government authority or any instrumentally thereof, or by any public or private port authority, for any delivery of Marine Fuel hereunder, then the BUYER shall be responsible for obtaining the same.  No deliveries shall be made until such time as the BUYER has obtained all required delivery permits.  All costs and expenses occasioned by BUYER's failure to timely obtain such delivery permits shall be paid by BUYER.

Delivery of Marine Fuel hereunder shall be made by delivery vessel provided or caused to be provided by the SELLER to the BUYER's Vessel at the Delivery Point agreed upon by the SELLER and the BUYER.  Unless otherwise agreed in the Principal Terms, the BUYER shall pay all the applicable delivery charges.

The BUYER shall give the SELLER written notices at least seventy-two (72), forty-eight (48) and twenty-four (24) hours prior to the Delivery Date of the estimated time(s) on such date when the Vessel will be ready to receive the Marine Fuel purchased by the BUYER.  In such notice the BUYER shall, if necessary, advise the SELLER of any special condition, peculiarity, deficiency or defect of or with respect to the Vessel or its equipment which might delay, hinder or otherwise affect the mooring, unmooring or bunkering of the VESSEL.  If the BUYER fails to provide these notices and the Vessel, for whatever reason, is unable or refuses to accept delivery on the Delivery Date, or if the BUYER provides such notice but requests an extension to the Delivery Date of more than thirty-six (36) hours after twelve(12) noon on such date, then the SELLER may, at its option, deliver the Marine Fuel to the Vessel at the



NuStar Energy Services, Inc.

requested new delivery time on a best efforts basis, suspend delivery subject to the BUYER's agreement to a new price for the Marine Fuel or cancel the delivery altogether, with or without prejudice to the SELLER's rights under this Agreement.

The BUYER shall pay not less than one hundred percent (100%) of the delivery costs of the quantity of Marine Fuel ordered, irrespective of the amount the BUYER takes delivery of, and the BUYER shall also be charged for all additional expenses incurred by the SELLER in connection with any failure by BUYER to take delivery of the full quantity (+/-5.0%) ordered by the BUYER. In the event the BUYER fails to take delivery of the full amount ordered or tendered (+/-5.0%), whichever is less, of Marine Fuel the SELLER may charge the BUYER the amount of loss sustained by having to sell the Marine Fuel in down-graded form at a lower price than that at which is was ordered by BUYER. SELLER furthermore reserves the right to levy and collect a cancellation fee of $5 per metric ton, with a minimum cancellation charge of $5,000 if the delivery is canceled, terminated, rescinded or refused by BUYER for any reason.

If the BUYER causes delays to the SELLER's vessels and/or facilities in effecting deliveries, the BUYER shall pay demurrage at the SELLER's established rates, and reimburse the SELLER's for all other expenses in connection therewith.

The Vessel receiving the Marine Fuel shall be solely responsible for making all connections and disconnections between the delivery hose and receiving Vessel's intake pipe, and shall render all other necessary assistance and provide sufficient tankage and equipment to receive promptly all delivers hereunder. The Vessel receiving delivery of the Marine Fuel shall be deemed to have sole and complete control, supervision and direction of the bunkering operations, including the responsibility for weather and sea conditions as they affect the delivery operations.

### 7.   TITLE AND RISK:

Delivery shall be considered complete and title to, risk of loss and liability for all Marine Fuel supplied hereunder shall pass from the SELLER to the BUYER as the Marine Fuel passes the flange of the Vessel or, in the case of delivery by drum, as the Marine Fuel passes the Vessel's rail, at which point Seller's responsibility shall cease and Buyer shall assume all risk of loss, damage, deterioration, or evaporation as to the Marine Fuel so delivered.

### 8.   DEMURAGE AND DELAYS:

The SELLER shall not be liable for any demurrage by the BUYER or the Vessel caused directly or indirectly by delays due to or resulting from weather (whether unusual or normal), local congestion at the Delivery Point affecting the SELLER's delivery equipment, the prior commitment, nonavailability and/or malfunction of delivery equipment, or any event of Force Majeure. The BUYER shall be liable for demurrage at rates established by the SELLER and for losses incurred by the SELLER as a result of any delay caused directly or indirectly by the BUYER or the Vessel in the use of delivery equipment.

### 9.   WARRANTIES:

The BUYER is solely responsible for specifying to the SELLER the type, grade and quantity of Marine Fuel to be supplied under this

Agreement. The SELLER warrants only that the Marine Fuel supplied shall conform to the specifications stated in the SELLER's signed confirmation document, and that SELLER will convey to BUYER title thereto free and clear of all taxes, liens and encumbrances existing or in favor of any third parties. ALL OTHER WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, WORKMANLIKE PERFORMANCE, OR OTHER WARRANTY OF QUALITY AND ANY OTHER CONDITIONS AND AGREEMENTS WHATSOEVER (WHETHER STATUTORY OR OTHERWISE) ARE EXPRESSLY EXCLUDED AND DISCLAIMED BY THE SELLER AND THE SELLER'S AGENTS MAKE NO WARRANTIES WHICH EXTEND BEYOND THE EXPLICIT DESCRIPTION CONTAINED IN THIS AGREEMENT.

THE BUYER'S SOLE AND EXCLUSIVE REMEDY SHALL BE LIMITED TO REPLACEMENT OF MARINE FUEL BY THE SELLER OR REIMBURSEMENT OF PURCHASE PRICE BY THE SELLER, LESS THE PROCEEDS OF ANY SALE OF THE MARINE FUEL WHICH THE BUYER MAY HAVE EFFECTED. REASONABLE REPLACEMENT COSTS SHALL BE FOR THE SELLER'S ACCOUNT UNLESS THE SELLER PROVIDES DUE NOTICE TO THE BUYER THAT THE SELLER DEEMS THE BUYER'S REJECTION OF MARINE FUEL TO BE WRONGFUL OR IN VIOLATION OF THIS AGREEMENT. THE BUYER'S SOLE REMEDY, AS SET FORTH ABOVE, IS TO THE EXCLUSION OF ALL OTHER REMEDIES, INCLUDING, BUT NOT LIMITED TO, CLAIMS FOR LOSS OR USE, DETENTION AND ALL OTHER INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING INJURY OR DAMAGE (i) TO VESSELS WHICH THE BUYER REPRESENTS OR IS RESPONSIBLE FOR AS AGENT, (ii) TO CONTENTS AND EQUIPMENT OF SUCH VESSELS, (iii) TO CARGO OR TO PERSONS ABOARD SUCH VESSELS OR ADJACENT THERETO, (iv) LOSS OF PROFIT, DELAYS, OR (v) ALL OTHER DAMAGES OF LIKE OR DIFFERENT KIND SUFFERED BY REASON OF THE PROVISION OF MARINE FUEL OR MECHANICAL FAILURE CAUSED BY SAID MARINE FUEL, AND WHETHER OR NOT OCCASIONED BY THE SELLER'S NEGLIGENCE. IF ANY PORTION OF THIS PARAGRAPH SHALL FOR ANY REASON BE DETERMINED TO BE VOID OR UNENFORCEABLE, THE REMAINDER OF THIS PARAGRAPH SHALL REMAIN IN FULL FORCE AND EFFECT.

### 10.   CLAIMS:

Any claim by the BUYER as to shortage must be submitted in the form of a letter of protest as no notation of any kind will be accepted on the Marine Fuel Delivery Note. If a letter of protest is not received within the fifteen (15) day time period described herein below, any claim for short delivery shall be deemed to be waived by BUYER. In any event, the SELLER's figures as to the quantity delivered to the BUYER's vessel shall be deemed conclusive. Any claim by the BUYER as to shortage in quantity of Marine Fuel delivered by the SELLER must be made within fifteen (15) days after the Marine Fuel is delivered. If the BUYER makes a claim regarding the quality or quantity of the Marine Fuel furnished by the SELLER, the BUYER shall permit, or obtain permission for a surveyor acting on the SELLER's behalf to board the BUYER's Vessel immediately, for the purpose of ullaging all Vessels' reservoirs, obtaining samples of the Marine Fuel, surveying all machinery which the BUYER asserts has been damaged, and all fuel oil handling machinery and procedures, and reviewing maintenance records and such other Vessel records as the surveyor deems appropriate. In the absence of the fifteen (15) day notice required hereunder and a survey on behalf of the SELLER, any such claim based on deficiency in quality shall be forever barred, and the



NuStar Energy Services, Inc.

BUYER shall pay the direct and indirect costs and expenses of obtaining the survey.

### 11. FINANCIAL RESPONSIBILITY:

All sales of Marine Fuel hereunder are made on the credit of the Vessel as well as on the credit of the BUYER.  The SELLER will have and may assert any and all maritime liens available to it against the Vessel, wherever found, for the full amount of the delivered price of the marine Fuel supplied to such Vessel by the Seller, plus accrued interest and collection costs.  If the BUYER in any way breaches this Agreement, defaults in the payment of any indebtedness to the SELLER (whether arising out of this Agreement or otherwise) or becomes bankrupt or insolvent, or if the SELLER at any time considers the financial condition of the BUYER to be unsatisfactory, then the SELLER may, in addition to any other rights and remedies it may have, cancel or suspend deliveries hereunder until such time as the BUYER remedies such breach or default and/or provides suitable additional security and/or guarantees acceptable to the SELLER.

### 12. INDEMNITY:

The BUYER shall indemnify and hold the SELLER and the SELLER's agents harmless from and against, (1) any and all claims, demands, actions, causes of action, suits and all other liabilities whatsoever on account of, or by reason of, or growing out of damage to property (including property of the SELLER, the BUYER and third parties) or for injury or death of any person (whether such person is an employee or agent of the SELLER, the BUYER or a third party), whether the same result from negligence, in whole or in part, of the BUYER or the BUYER's employees, breach of the BUYER's warranties character, or any other theory of liability of the like or different character; (2) any claim asserted by the BUYER, its agents or employees or subcontractors, including, but not limited to claims for personal injury or property damage arising out of the delivery of Marine Fuel under this Agreement, including a claim based solely upon the negligence or culpability of the SELLER and (3) all costs and expenses incurred by the SELLER in investigating and defending any such claim, demand, suit or liability, including the SELLER's attorney fees and court costs.

### 13. COLLECTIONS:

Without limitation to the SELLER's rights hereunder or otherwise, any payment not made on the due date shall bear interest at the rate of the lesser of (i) one and one-half percent (1-1/2%) per month, or (ii) the maximum rate allowed by law, running from the due date until the date payment is received by the SELLER's bank. In the event the SELLER institutes legal proceedings for collection of payment not made by the BUYER when due, all expenses incurred by the SELLER in connection with such proceedings (including, without limitation, attorneys' fees and court costs) shall be for the BUYER's account.

### 14. LIMITATION OF LIABILITY:

The Seller shall not be liable for special, indirect, consequential, punitive or exemplary damages of any kind arising out of or in connection with the performance or non-performance of this Agreement.

### 15. ENVIRONMENTAL PROTECTION:

The BUYER represents and warrants that the Vessel is properly insured, equipped, maintained and operated so as to avoid the escape, spillage or discharge of oil (a "spill") at the time of all deliveries of Marine Fuel hereunder.  If a spill does occur while Marine Fuel is being delivered by the SELLER to the BUYER and the Vessel, then the Buyer shall promptly take such action as is reasonably necessary to remove the oil and mitigate the effects of such spill; however, notwithstanding the cause of such spill, the SELLER is hereby authorized at its/their option, to take such measures and incur such expenses (whether by employing its own resources or by contracting with others) as are reasonably necessary to remove the oil and mitigate the effects of such spill. In the event the SELLER has exercised its option to remove the oil and mitigate the effects of such spill as aforesaid, the BUYER agrees to cooperate and render such assistance as is reasonably requested by the SELLER and further agrees that BUYER or their insurance carrier shall promptly pay any and all expenses, damages, costs, fines and penalties arising from such spill or any pollution caused thereby.  The BUYER or their insurance shall recover from the SELLER only that amount of expenses, etc. equal to the degree of provable negligence of the SELLER as determined by SELLER's insurance settling agent.  The BUYER and SELLER shall each give the other copies of all documents and other information concerning the spill as required by any law, regulation, or settling agent.

### 16. FORCE MAJEURE:

In the event that the SELLER is prevented from making deliveries hereunder or the BUYER is prevented from accepting deliveries due directly or indirectly to any Force Majeure, the obligation of the SELLER to deliver and of the BUYER to receive Marine Fuel shall be suspended during the continuance of such Force Majeure condition and neither party shall be liable to the other for demurrage, loss or damage of any nature whatsoever due to such delay.  In the event the SELLER does not at any time have available sufficient Marine Fuel to supply all of the SELLER's customers due to the intervention of Force Majeure circumstances, the SELLER shall have the right to prorate such Marine Fuel as may be available between the BUYER and all other customers of the SELLER, and the SELLER shall not be required to purchase Marine Fuel to replace supplies so curtailed, or to make use of other than the SELLER's normal transportation or other facilities.  Nothing in this article concerning the existence of Force Majeure circumstances shall affect the BUYER's obligation to make payment to the SELLER for deliveries of Marine Fuel made and payments required hereunder which accrued prior to the occurrence of the Force Majeure circumstances.  Until the Force Majeure circumstances shall cease to exist, this contract merely shall be suspended and shall not terminate.  If a Force Majeure event occurs, the SELLER shall have the option of cancelling this contract.  Force Majeure shall include, but not be restricted to, acts of God or the public enemy, perils of navigations, floods, fire, hostilities, war (declared or undeclared), executive or administrative orders or acts of either general or particular application of any de jure or de facto government having or claiming jurisdiction over a party or vessel, facility or supplies, or such orders or acts of any officer or agent purporting to act under the authority of any such government, or requests of any such officer or agent purporting to act, under the authority of any such government, of requests of any such officer or agent purporting to act, illegality arising from applicable domestic or foreign laws or regulations, blockage, labor disturbances, strikes, riots, insurrections, civil commotions, storms, earthquakes, accidents, breakdown or injury to or expropriation,



NuStar Energy Services, Inc.

confiscation or requisitioning of transportation or delivery facilities exhaustion or unavailability of supplies for any reason, partial or total interruption, loss or shortage of transportation facilities, or imposition of restrictions or regulations by any government or governmental agency which render performance impossible or frustrate the commercial purpose of this contract.

## 17. NOTICES:

All notices, statements or other communications to be given by the BUYER to the SELLER shall be sufficient if given in writing by registered mail, telex or cable as follows:

To the BUYER: At the address stated in the Principal Terms, or if the Agreement is concluded by or through an agent of the BUYER, to such agent.

To the SELLER: NUSTAR ENERGY SERVICES, INC.
2330 North Loop 1604 West
San Antonio, TX 78248

## 18. ASSIGNMENT:

The BUYER may not assign any of its rights or obligations under this Agreement without the SELLER's prior written consent.

## 19. DISPUTES:

Any judicial proceeding brought in connection with this Agreement may be brought in any court of competent jurisdiction in Houston, TX; and both parties hereby (i) accept, generally and unconditionally, the exclusive jurisdiction of such courts and any related appellate courts, and irrevocably agree to be bound by any judgment rendered thereby, subject to any right of appeal, and (ii) irrevocably waive any objection they may now or hereafter have as to any such proceeding brought in such a court or that such court is an inconvenient forum. The SELLER shall have the right under the laws of the State of Texas, or such other law as may be deemed applicable in the circumstances, to arrest the BUYER's Vessel or attach property of the BUYER whether said BUYER's Vessel and property are within the United States of America or elsewhere.  The agreement to litigate all disputes arising under this contract in any court of competent jurisdiction in Houston, TX, shall not be construed as altering, waiving or otherwise depriving the SELLER of the right to arrest the BUYER's Vessel, or to attach the BUYER's property in a jurisdiction other than the United States of America.  No action or other proceedings shall be brought by the BUYER for any alleged breach of this Agreement more that one (1) year after the accrual of the cause of action therefore; provided, however, that nothing in this Section 19 shall be deemed to extend any periods within which the BUYER must assert the BUYER's rights, including, but not limited to, rejection rights, as provided in this Agreement.

## 20. GOVERNING LAW:

This Agreement shall be interpreted in accordance with the law the State of Texas, applicable to agreements made and to be performed entirely within the United States of America without regard to any conflict of laws provision or case law of the United States of America which would otherwise cause the application of the law of any other jurisdiction.  The United Nations Convention on Contracts for the International Sale of Goods (1980) shall not apply.

## 21. TAXES:

Buyer will pay all taxes and assessments arising out of sale of the Product, including any import fee, export fee, customs duty, sales tax, excise tax, or value added tax, but excluding any income tax assessed against NuStar.

## 22. MISCELLANEOUS:

This Agreement may not be modified, discharged or terminated except by an instrument in writing signed by each of the parties hereto.

 No benefit or right accruing to either party shall be waived unless the waiver is reduced to writing and signed by both parties.  No waiver by either party of any provision of this Agreement shall be construed as a waiver of any other provision, nor shall a waiver of any single default be construed as a waiver of any other prior or subsequent like or different default.

The terms and conditions of this Agreement shall extend to, be binding upon and inure to the benefit of the successors, administrators, legal representatives, and permitted assigns of the respective parties hereto.

The descriptive headings contained in this Agreement are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

This Agreement constitutes the entire understanding between the parties and supersedes all prior oral or written agreements, representations, and/or warranties.

It shall be the responsibility of BUYER to comply and advise its employees, agents, and customers to comply with the health and safety requirements for each of the Marine Fuels supplied hereunder as specified in the SELLER's published health and safety information then current for such Marine Fuel, both during and after delivery, and to ensure so far as possible that any user of any such Marine Fuels avoids, without limitation, any frequent or prolonged exposure or skin contact with the Marine Fuel.  Seller accepts no responsibility for any consequences arising from any failure by such persons to comply with such health and safety requirements or arising from such contact.

# EXHIBIT E

## MARINE FUEL DELIVERY NOTE

**NuStar**

**NuStar Energy Services, Inc.**

PO BOX 781609
San Antonio, TX 78248
Tel: 210-918-2000
Fax: 210-918-3521
E-Mail: bunkers@nustarenergy.com

| VESSEL NAME: | IMO NO.: | DATE: |
|---|---|---|
| Azurit | 9551703 | 10-21-2014 |
| DELIVERY LOCATION: | ORDER NO.: | AGENT: |
| Greensport | 0040213047 | Wilhelmsen |
| BARGE NAME / DOCK# / OTHER: | | |
| Kirby 27775 | | |

| PRODUCT | GROSS BBLS | NET BBLS | TEMP | WEIGHT METRIC TONS |
|---|---|---|---|---|
| IF380 LS | 1231.88 | 1198.30 | 129.0 | 186.02 |
| IF380 HS | 2676.31 | 2612.00 | 121.5 | 410.01 |
| MGO | 37.86 | 37.26 | 91.3 | 5.02 |

| GRADE | VISCOSITY CST @ 50C | API | FLASH POINT °F | POUR POINT °F | WATER % | SEDIMENT % | VAN % | DETAIL SAMPLE RETD. SEAL |
|---|---|---|---|---|---|---|---|---|
| IF380 LS | 300 | 1327 | 190 | 31 | 7.4 | 0.93 | 24 | NA |
| IF380 HS | 360.0 | 1168 | 180 | 21 | 17.292 | 3.25 | 151 | NA |
| MGO | 3.6 | 3539 | 164 | 19 | 0.022 | 0.09 | 0 | 53.9 |

** The above specifications are only to be used as typical only (with the exception of sulfur)**
DMA (ONLY) DYED DIESEL FOR NON-TAXABLE USE ONLY

| | | DATE | TIME |
|---|---|---|---|
| BARGE ALONGSIDE | | 10/21 | 0855 |
| HOSE CONNECTED | | 10/21 | 1000 |
| STARTED PUMPING | | 10/21 | 1135 |
| FINISHED PUMPING | | 10/21 | 1120 |
| HOSE DISCONNECTED | | 10/21 | 1650 |
| BARGE AWAY | | 10/21 | 1758 |

| SAMPLES/SEAL # | IFO380 LS | IFO380 HS | MGO/MDO |
|---|---|---|---|
| SHIP | 3614424 | 3614427 | 3614470 |
| NESI | 3614421 | 3614428 | 3614425 |
| NESI | 3614422 | 3614429 | 3614426 |
| MARPOL | 3614423 | 3614430 | 3614469 |

| | YES | NO |
|---|---|---|
| VESSEL REPRESENTATIVE WINTNESSED SAMPLING | ☐ | ☒ |
| VESSEL REPRESENTATIVE WITNESS GUAGING/METER | ☒ | ☐ |

ANY DISCLAIMER BY THE PURCHASER OF THE MARINE FUELS COVERED BY THIS NOTE WILL HAVE NO FORCE OR EFFECT, REGARDLESS OF WHETHER THE DISCLAIMER IS IN THE FORM OF A STAMP, A HANDWRITTEN STATEMENT, OR ANY OTHER FORM. WITHOUT LIMITING THE FOREGOING, NO DISCLAIMER BY THE PURCHASER OF MARINE FUELS COVERED BY THIS NOTE WILL ALTER OR WAIVE: THE INFORMATION CONTAINED IN THIS NOTE; THE SELLER'S MARITIME LIEN AGAINST THE RECEIVING VESSEL FOR THE COST OF THE MARINE FUELS COVERED BY THIS NOTE; OR THE RECEIVING VESSEL'S LIABILITY FOR THE COST OF THE MARINE FUELS COVERED BY THIS NOTE.

THE SAMPLE RETAINED BY SELLER WILL BE DEEMED THE ONLY REPRESENTATIVE SAMPLE OF THE MARINE FUELS COVERED BY THIS NOTE. NO SAMPLE RETAINED BY THE PURCHASER MAY BE USED AS EVIDENCE IN ANY LEGAL PROCEEDING ARISING OUT OF THE SALE OF MARINE FUELS TO WHICH THIS NOTE IS RELATED.

SUPPLIER CONFIRMS THAT THE FUEL OIL DELIVERED CONFORMS TO REGULATIONS 14 AND 18 OF ANNEX VI OF MARPOL 73/78.

_Scott Slaughter_
NuStar Energy Services, Inc.

Master / Chief Engineer

# EXHIBIT F



NuStar Energy Services, Inc.
19003 IH-10 West
San Antonio TX, 78257
1-800-711-6257

## Invoice 90430732 / 11/04/2014

Order NO. 282289     Delivery NO. 2420088714     Customer NO. 109364

**BILL TO:**
O.W. BUNKER USA, INC
2603 AUGUSTA DRIVE
Houston, TX 77057

**WIRING INSTRUCTIONS:**
NuStar Energy Services, Inc.
JPMorgan Chase Bank, N.A.
New York, NY
ABA: 021000021
Acct Nbr. 323381729
SWIFT Code: CHASUS33

| CONTRACT NO: | 40213047 |
|---|---|
| SHIPPING ORDER: | 173338 |
| DELIVERY DATE: | 10/21/2014 |
| ORIGIN: | B620 Texas City Vessel Bunkering |
| PORT: | HOUSTON |
| TERMS OF DELIV: | Vessel intake Flenge |
| VESSEL: | AZURIT |
| BROKER: | |

**NOTE:**

| PRICING ELEMENT | PRICE | QTY | UOM | BILLED |
|---|---|---|---|---|
| INTERMEDIATE FUEL OIL 380 | 471.630000  / MT | 410.010 | MT | 193,373.02 |
| Security fee | 0.044100  / MT | | | 18.08 |
| Wharfage fee | 0.30 / MT | | | 123.00 |
| Barging + srchg(min) | | | | 10,980.20 |
| Harbor fees-IFO(max) | | | | 32.00 |
| LOW SULFUR IFO380 | 514.910000  / MT | 186.020 | MT | 95,783.56 |
| Security fee | 0.044100  / MT | | | 8.20 |
| Wharfage fee | 0.30 / MT | | | 55.81 |
| MARINE GAS OIL - DMA | 895.000000  / MT | 5.020 | MT | 4,492.90 |
| Harbor fees-MGO | | | | 32.00 |

Due in USD on 11/19/2014                                                                 304,898.77

TERMS:  WIRE 30 CAL DAYS FROM DELIVERY

NOTICE:  ALL COMMUNICATIONS OR QUESTIONS CONCERNING DISPUTED DEBTS, ARE TO BE SENT TO: NUSTAR ENERGY SERVICES - ATTN: BUNKERDEPT.  PO BOX 781609 SAN ANTONIO, TX 78278-1609. FOR OTHER BILLING QUESTIONS:CALL 1-800-711-6257.

# EXHIBIT G



M/V  AZURIT
AND/OR OWNERS/CHARTERERS

SK B&T PTE.LTD
9 RAFFLES PLACE, #53-02
REPUBLIC PLAZA
Singapore, SG-048619
Singapore

**DATE OF INVOICE :**   **21. October 2014**

**INVOICE NO**          :   **199-141310**

ORDER NO.              :   199-12287

DATE OF SUPPLY         :   21. October 2014

PORT: HOUSTON
YOUR REFERENCE:

**DUE DATE**            :   **19. November 2014**

| Quantity supplied | Quality/description | Price/per | Invoice amount |
|---|---|---|---|
| 410.010  MT | Fueloil 380-CST 3,5% | 530.50  MT | 217,510.31 |
| 186.020  MT | 380-CST 1% | 574.00  MT | 106,775.48 |
| 5.020  MT | Gasoil 0,1% | 899.00  MT | 4,512.98 |
| 1.000  LPS | harbour fee | 64.00  LPS | 64.00 |
| 1.000  LPS | security charges | 26.28  LPS | 26.28 |
| 1.000  LPS | Barging | 10,980.20  LPS | 10,980.20 |
| 1.000  LPS | Surcharge | 178.81  LPS | 178.81 |

| | | | | |
|---|---|---|---|---|
| Your VAT No. | 201220664N | VAT Amount | USD | 0.00 |
| Our VAT No. | | Total | USD | 340,048.06 |

The prices are excl. all taxes and/or other fees.

**TERMS OF PAYMENT** 30 days from date of supply With value date not later than DUE DATE or previous working day
when it is a holiday. In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

**BANK:**      ING Bank N.V.

**ACCOUNT:**   IBAN: NL67 INGB 0020 0143 76
               IBAN: NL42 INGB 0650 0505 84

               SWIFT: INGBNL2A

USD and all other currencies
EUR

**O.W. BUNKER MIDDLE EAST DMCC**
Indigo Tower, Office #709-710 Jumeirah Lake Towers
P.O.Box 486052 Dubai UAE

+82 70 7432 0000
+82 27770340

Per telegraphic transfer directly to our account without deduction
of bank charges which are for buyers account.

# EXHIBIT H

**Keith W Heard - Burke & Parsons NY**

| | |
|---|---|
| **Subject:** | 전달: RE: MV Azurit - Claim by NuStar Energy Services, Inc for Unpaid Bunkers stemmed by SK Shipping |
| **From:** | 조인식(IN-Sik Cho)/벌크정기선운항팀/SKSHIP <insik.cho@sk.com> |
| **Date:** | 1/28/2015 4:00 PM |
| **Attachments:** | ⬜ removed.txt (17179869184 GB), ⬜ image001.jpg (17179869184 GB), ⬜ image002.jpg (17179869184 GB), ⬜ image001.jpg (17179869184 GB), ⬜ image002.jpg (17179869184 GB), ⬜ image002.jpg (17179869184 GB), ⬜ image003.jpg (17179869184 GB), ⬜ image001.jpg (17179869184 GB) |
| **CC:** | Operation/????/SKSHIP <operation@sk.com>, breakbulk1/????/SKSHIP <breakbulk1@sk.com>, "???(Kim Sung Soo)/???/SKSHIP" <ss.kim@sk.com>, "???(Jung-Kee Min)/???/SKSHIP" <jamesmin@sk.com>, "???(Kim Hyun Nah)/???/SKSHIP" <hyunnakim@sk.com> |
| **To:** | "???(Kim Hyung Ho)/?????/SKBNT" <hh.kim@sk.com>, "???(Jun Joo-Hyun)/???(BnT)/SKBNT" <jhjun@sk.com> |

toktok Mobile에서 보냈습니다.

---

보낸 사람: Letourneau, Keith
보낸 날짜: 2015년 1월 28일 수요일 오후 3:35:54
받는 사람: BBG Insurance
참조: Elli Gavrielides (Elli.Gavrielides@westpandi.com); Meadows Thomas; Regina Noemmerga; Joachim Zeppenfeld; 'Raffaella.Immacolato@conti-online.de'; 'Josef.Sedlmeyr@conti-online.de' (Josef.Sedlmeyr@conti-online.de); Vivienne Pitroff; Andrew Leir; BBG Operation; Kamini.Thillainathan@shlegal.com; 조인식(IN-Sik Cho)/벌크정기선운항팀/SKSHIP
제목: RE: MV Azurit - Claim by NuStar Energy Services, Inc for Unpaid Bunkers stemmed by SK Shipping

Dear Capt. Nils-Volker Goebel,

We received and thank you for your email below.  NuStar has previously been in touch with counsel for SK B&T Pte Ltd. (reading in copy), who advised that it only acted as a bunker purchasing agent and otherwise denied that NuStar's possesses a maritime lien claim against the vessel.

It is NuStar's position that it indeed possesses such a claim for the provision of necessaries (bunker fuel) in the United States to the vessel AZURIT.  As a result of OW Bunker's insolvency, NuStar has arrested numerous vessels to date and obtained security for similar maritime lien claims.  NuStar reserves all rights and remedies with respect to AZURIT.

Very truly yours,

Keith Letourneau

**Keith B. Letourneau | Blank Rome LLP**
700 Louisiana Suite 4000 | Houston, TX 77002-2727
Phone: 713.632.8609 | Fax: 713.228.6605 | Cell: 713-398-8129

전달: RE: MV Azurit - Claim by NuStar Energy Services, Inc for Unpai...

Case 1:15-cv-02141-VEC   Document 1   Filed 03/20/15   Page 47 of 52

Email: KLetourneau@BlankRome.com

---

**From:** BBG Insurance [mailto:insurance@bbg-shipmanagement.com]
**Sent:** Wednesday, January 28, 2015 8:53 AM
**To:** Letourneau, Keith
**Cc:** Elli Gavrielides (Elli.Gavrielides@westpandi.com); Meadows Thomas; Regina Noemmerga; Joachim Zeppenfeld; 'Raffaella.Immacolato@conti-online.de'; 'Josef.Sedlmeyr@conti-online.de' (Josef.Sedlmeyr@conti-online.de); Vivienne Pitroff; Andrew Leir; BBG Operation
**Subject:** WG: MV Azurit - Claim by NuStar Energy Services, Inc for Unpaid Bunkers stemmed by SK Shipping

Dear Sirs,

We write with reference to your message of 23 January 2015 demanding payment for bunkers supplied by your clients to the MV "AZURIT".

The bunkers in question were not ordered by Owners, but by the vessel's charterers at the time, SK Shipping Co. Ltd., whose full contact details are as follows:


SK SHIPPING CO., LTD. SEOUL, KOREA
------------------------------------------------------------
Insik Cho / Breakbulk Operation Team

Phone: +82-2-3788-8705
Fax: +82-2-3788-8798
Mobile: +82-10-9259-8477
E-Mail: insik.cho@sk.com<mailto:insik.cho@sk.com>


We have advised SK Shipping of your clients' demand for payment and instructed them to take the matter up with your clients, and they have advised us that they are doing so.

We therefore ask that you/your clients take the matter up directly with SK Shipping who are the responsible party since it was they and not Owners who ordered the bunkers in the first place.

Best regards / Mit freundlichem Grüßen
i.V. Capt. Nils-Volker Goebel
(Manager Claims and Insurance)

Bremer Bereederungsgesellschaft mbH & Co. KG
Claims and Insurance Department
Bahnhofstr. 28 - 31
D-28195 Bremen

Tel.: +49 421 33 88 3 42
Fax: +49 421 33 88 3 92
Mobil: +49 174 209 86 76

insurance@bbg-shipmanagement.com

전달: RE: MV Azurit - Claim by NuStar Energy Services, Inc for Unpai...

Case 1:15-cv-02141-VEC   Document 1   Filed 03/20/15   Page 48 of 52

goe@bbg-shipmanagement.com
www.bbg-shipmanagement.com

"Bremer Bereederungsgesellschaft mbH & Co. KG" is acting as Manager and/or Agent only.
Orders for services/supplies are in the name and for the account of the vessel/owner only.

Confidentiality Notice :
Privileged/Confidential information may be contained in this message. If you are not the addressee indicated in this message, you may not copy or deliver this message to anyone. In such case, You should destroy this message and inform us immediately. Opinions, conclusion and other information expressed in this message that do not relate to the official business of the Company shall be understood as being neither approved nor endorsed by the Company.

Amtsgericht Bremen, HRA 22 917
Persönlich haftende Gesellschafterin: Bremer Geschäftsführungs- und Bereederungs GmbH
Geschäftsführer: Hartmut Hollenbach, Joachim Zeppenfeld
Amtsgericht Bremen, HRB 21 234
Sitz der Gesellschaften: 28195 Bremen
USt-ID-Nr. : DE 813 631 172


---------------------------------------

M /V AZURIT        23.01.2015
CONTI 1 85 SCHIFFAHRTS
c/o BBG-BREMER BEREEDERUNGSGESELL
Bahnhofstrasse 28-31, 28195 Bremen, Germany.

Dear Sir:

We are counsel for NuStar Energy Services, Inc. ("NuStar") concerning its maritime lien claim against the vessel AZURIT for the provision of bunker fuel to that vessel in the United States.  NuStar's invoice for USD 304,898.77 for the supply of these bunkers remains unpaid.  *See* accompanying invoice.

NuStar proposes that vessel interests make direct payment to NuStar for NuStar's bunker invoice.  If your company is hesitant to make the direct payment at this time, then we propose that the vessel interests pay the bunker invoice into a segregated account where NuStar will hold the monies in trust pending resolution of NuStar's claim of entitlement to said monies.  In these circumstances, NuStar possesses a maritime lien on the vessel for the supply of necessaries at a U.S. port, and this maritime lien secures payment to NuStar for the supply of bunkers to the vessel.

We attach a proposed letter agreement for the vessel interests to pay the bunker invoice into NuStar's segregated account, to be held in trust pending resolution of NuStar's claim, and for vessel interests to enter an appearance on behalf of the vessel *in rem* in a lawsuit to be filed by NuStar in Houston to seek resolution of NuStar's maritime lien claim and entitlement to the monies held in trust.  We believe this letter agreement presents a fair and reasonable interim solution, but if you prefer then we are willing to discuss other potential solutions to payment for the bunkers.

We respectfully request your expeditious response to our proposal.

We reserve all rights and remedies available to NuStar, and extend this proposal without prejudice to same.

Regards,

Keith Letourneau

**Keith B. Letourneau | Blank Rome LLP**
700 Louisiana Suite 4000 | Houston, TX 77002-2727
Phone: 713.632.8609 | Fax: 713.228.6605 | Cell: 713-398-8129
Email: KLetourneau@BlankRome.com


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*›

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*›

# EXHIBIT I



**NOTICE OF ENFORCEMENT EVENT**

SK B&T PTE.LTD
9 RAFFLES PLACE, #53-02
REPUBLIC PLAZA
SG-048619 Singapore
SINGAPORE

7 November 2014

Dear Sirs,

**English Omnibus Security Agreement dated 19 December 2013 between O.W. Bunker & Trading A/S and certain of its subsidiaries (as Chargors) and ING Bank N.V. as Security Agent (the Security Agreement)**

We refer to the notice(s) received by you pursuant to the Security Agreement (the Notice) under which the relevant Chargor gave you notice it had assigned by way of security to ING Bank N.V. all its rights in respect of a supply contract with you as may be constituted or supplemented by the OWB general terms and conditions as provided to you and as amended, restated or supplemented from time to time (the Contract).

1.        Pursuant to the Notice, the relevant Chargor authorised and instructed you without further obligation to it to pay all amounts payable under any invoice issued in respect of the relevant Contract, including but not limited to the following invoices

| Document No | Currency | Invoice Amount | Invoice Date | Due Date | Sales Order No |
|---|---|---|---|---|---|
| 199-141310 | USD | 340,048.06 | 21-Oct-14 | 19-Nov-14 | 199-12287 |
| 199-141218 | USD | 1,545,600.00 | 09-Oct-14 | 07-Nov-14 | 199-12198 |
| 199-141212 | USD | 111,420.00 | 13-Oct-14 | 11-Nov-14 | 199-12266 |
| 199-141277 | USD | 512,980.62 | 17-Oct-14 | 15-Nov-14 | 199-12317 |
| 199-141197 | USD | 577,346.72 | 02-Oct-14 | 31-Oct-14 | 199-12263 |
| 199-141325 | USD | 613,657.08 | 19-Oct-14 | 17-Nov-14 | 199-12330 |
| 199-141169 | USD | 712,423.16 | 30-Sep-14 | 29-Oct-14 | 199-12227 |
| 199-141300 | USD | 791,698.58 | 21-Oct-14 | 19-Nov-14 | 199-12379 |
| 199-141311 | USD | 807,948.66 | 26-Oct-14 | 24-Nov-14 | 199-12380 |
| **Total selection** | **USD** | **6,013,122.88** | | | |

to the following account with ING Bank N.V.:

| | | |
|---|---|---|
| NL10 INGB 0651 3696 81 | EUR | O.W. Bunker & Trading A/S |
| NL26 INGB 0020 1180 31 | USD | O.W. Bunker & Trading A/S |
| NL29 INGB 0020 1180 74 | GBP | O.W. Bunker & Trading A/S |
| NL82 INGB 0020 1180 90 | DKK | O.W. Bunker & Trading A/S |
| NL48 INGB 0020 1181 20 | NOK | O.W. Bunker & Trading A/S |
| NL20 INGB 0020 1181 39 | SEK | O.W. Bunker & Trading A/S |
| NL51 INGB 0020 1181 63 | SGD | O.W. Bunker & Trading A/S |
| NL29 INGB 0020 1181 71 | CAD | O.W. Bunker & Trading A/S |
| NL42 INGB 0020 1182 28 | AED | O.W. Bunker & Trading A/S |
| NL20 INGB 0020 1182 36 | CHF | O.W. Bunker & Trading A/S |
| NL13 INGB 0020 1196 23 | RUB | O.W. Bunker & Trading A/S |

2.      The Notice also provided that any amendment to these payment instructions may not be made without the express written consent of ING Bank N.V.

3       ING Bank N.V. has not consented, whether in writing or otherwise, to any amendments to the Notice. However, please note that any payments by you in accordance with the Notice will continue to extinguish the corresponding payment obligations to the relevant Chargor in respect of the relevant invoices under the relevant Contract.

4.      **However, please also note that any payment by you which is not made in full compliance with the Notice will NOT extinguish the relevant payment obligation to the relevant Chargor in respect of invoices under the relevant Contract and you will remain fully liable all amounts outstanding. Each relevant Chargor will also be held liable for any damages, costs or losses to any Finance Party as a result thereof.**

5.      Notwithstanding that the above mentioned accounts are held in the name of a Chargor (as an administrative matter), we collect the underlying receivable in our capacity as Security Agent and any payment to any Collection Account therefore constitutes a payment to us in our capacity as Security Agent and does not constitute a payment to that Chargor.

6.      All rights, powers and discretions of the relevant Chargor under the Contract are now exercisable by, and notices must be given to, ING Bank N.V. or as it directs.

7.      This letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

Please acknowledge receipt of this letter as a matter of urgency by signing the acknowledgement and sending a copy of the signed letter back to the Security Agent at ING Bank N.V., Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands (Loc.code: AMP N 04 046) Attention: Agency Desk – Ops & IT Banking Wholesale Lending Operations Agency.

Yours faithfully,

.........................................

ING Bank N.V.
in its capacity as Security Agent

We hereby acknowledge the terms set out above:

.........................................

SK B&T PTE.LTD